**OREGON NATURAL DESERT ASSOCIATION; Oregon Trout, Inc.; Oregon Natural Resources Council; Oregon Wildlife Federation; Oregon Chapter, Sierra Club; Central Oregon Audubon Society; Northwest Environmental Defense Center; Rest the West; American Rivers, Inc.; National Parks and Conservation Association; National Wildlife Federation, Plaintiffs,**

**v.**

**Michael GREEN, in his official capacity as Burns District Manager, Bureau of Land Management, Miles Brown, in his official capacity as Andrews Area Manager, Bureau of Land Management; United States Bureau of Land Management, an agency of the United States Department of the Interior, Defendants,**

**Harney County, a political subdivision of the State of Oregon; Gerald and Maxine Nyman, and Rex Clemens Ranches, Inc., Defendant–Intervenors.**

Civil No. 95–2013–HA.

United States District Court, D. Oregon.

Jan. 31, 1997.

Peter M.K. Frost, National Wildlife Federation, Portland, OR, Todd D. True, Adam J. Berger, Sierra Club Legal Defense Fund, Seattle, WA, for Plaintiffs.

Kristine Olson, United States Attorney, District of Oregon, Thomas C. Lee, Assistant United States Attorney, Portland, OR, for Defendants.

Ronald S. Yockim, Roseburg, OR, for Defendant–Intervenor Harney County.

Daniel E. O'Leary, Davis Wright Termaine, Portland, OR, for Defendant–Intervenors Gerald and Maxine Nyman and Rex Clemens Ranch, Inc.

## OPINION AND ORDER

HAGGERTY, District Judge:

### CASE STATUS

Plaintiffs, various named environmental groups (collectively referred to as "ONDA"), filed this action against the Bureau of Land Management and two named individuals, Michael Green and Miles Brown, in their official capacities (collectively referred to as "BLM"), alleging violations of two federal environmental statutes and the Administrative Procedure Act. ONDA challenges the comprehensive management plan for the Donner und Blitzen River issued by BLM in 1993; ONDA also challenges subsequent site-specific decisions that BLM issued. ONDA seeks an order from the court declaring that: 1) the river management plan BLM prepared for the Donner und Blitzen Wild and Scenic River violates the Wild and Scenic Rivers Act, 16 U.S.C. §§ 1271–1287; 2) the environmental assessment BLM prepared to analyze the environmental impacts of implementing the river management plan, and alternatives to it, violates the National Environmental Policy Act, 42 U.S.C. § 4321; and 3) BLM violated the National Environ-

mental Policy Act by failing to prepare an environmental impact statement to analyze the cumulative impacts of similar and connected actions in the river area. Moreover, ONDA seeks to enjoin BLM from any further implementation of the activities authorized in the river management plan.

Harney County filed a motion to intervene as a defendant in this action on the ground that it had a significant interest in the "wise and proper" implementation of the management plans for the Donner und Blitzen River, which affect lands within Harney County. In addition, Harney County shares in the revenue received by BLM from the term grazing permits that have been issued on the affected lands. On March 26, 1996, the court granted the motion to intervene filed by Harney County.

Gerald and Maxine Nyman and Rex Clemens Ranches, Inc. filed a motion to intervene as defendants on the ground that they had been issued a term grazing permit by BLM to graze livestock in the area at issue in this action. On May 13, 1996, the court granted the motion to intervene filed by Gerald and Maxine Nyman and Rex Clemens Ranches, Inc.

Pending before the court are ONDA's Motion For Summary Judgment (doc. # 23) and defendant-intervenor Harney County's Motion For Summary Judgment (doc. # 93). Oral argument was heard on these matters and, for the reasons that follow, ONDA's Motion For Summary Judgment is GRANTED. All other pending motions are denied as moot.

## BACKGROUND

In 1968, Congress enacted the Wild and Scenic Rivers Act ("WSRA"), Pub.L. 90–542, 82 Stat. 906 (Oct. 2, 1968). In 1988, Congress designated the Donner und Blitzen River in Oregon as a component of the WSRA. Omnibus Oregon Wild and Scenic Rivers Act of 1988 ("OOWSRA") Pub.L. No. 100–557, § 102, 102 Stat. 2782 (Oct. 28, 1988) (codified at 16 U.S.C. § 1274(a)(74)). At the time Congress designated the Donner und Blitzen River, it also classified the entire river area as "wild."

The WSRA defines a wild river area as "free of impoundments and generally inaccessible except by trail, with watersheds or shorelines essentially primitive and waters unpolluted. These represent vestiges of primitive America." 16 U.S.C. § 1273(b). The WSRA required BLM to issue a "comprehensive management plan" to protect the river area's "outstandingly remarkable values." 16 U.S.C. § 1274(d)(1); 16 U.S.C. § 1271. The WSRA provides that the river plan "shall address resource protection, development of lands and facilities, user capacities, and other management practices necessary or desirable to achieve the purposes of this chapter." 16 U.S.C. § 1274(d)(1).

The river area includes outstandingly remarkable vegetation, fisheries, wildlife, scenery, recreation, geology and cultural values. Of the 74.8 miles of streambed, 63 miles are publicly-owned and 11.8 miles are privately-owned. The river area is comprised of a total of 22,265 acres of land; 19,353 acres are publicly-owned and 3,312 acres are privately-owned.

In 1991, BLM hired five scientists from the Nature Conservancy to survey and report on sensitive native plants and unique natural areas in the river area. The scientists reported that the river area possesses an extraordinary number and diversity of native plant species. They also reported that the river area possesses plant communities that are rare in the Great Basin region. According to ONDA, the scientists determined that cattle grazing has had a broad scale adverse effect on native plants and plant communities. BLM and intervenors dispute this assertion and submit that the scientists actually stated that "[g]razing has had a broad scale effect upon the riparian and upland vegetation in the Blitzen River system." Harney County submits that the report also noted the "overall high quality condition of the natural communities found within the river corridor." The scientists expressed specific concern about the lack of reproduction in woody plant species in riparian areas.

The scientists unanimously recommended that BLM remove grazing from the entire river corridor and prevent any trespass cat-

tle. BLM points out, however, that the Nature Conservancy biologist who authored the sensitive plants report subsequently advised BLM in comments on the River Plan that, while grazing should be banned "in the canyons of the river," grazing in the South Fork of the Blitzen was "recognized as not being as easily controlled as the river does not flow through steep canyons," and that a "well crafted" allotment management plan should be adopted to protect that part of the river.

In 1993, BLM issued an environmental assessment ("EA") under the National Environmental Policy Act ("NEPA") that purported to disclose and analyze all relevant environmental impacts of a proposed river plan and two alternatives. Donner und Blitzen National Wild and Scenic River Management Plan and Environmental Assessment (May 1993) ("River Plan"). Subsequently, BLM issued a Decision Notice to adopt the proposed River Plan. BLM also issued a finding that implementing the River Plan would have no significant impact on the human environment. Since issuing the River Plan, BLM has issued at least two other site-specific decisions that tier to and implement the River Plan.

ONDA maintains that cattle grazing has degraded and continues to degrade native plants and plant communities in part of the river area. BLM and intervenors agree that, in the past, cattle grazing has degraded native plants and plant communities in part of the river area. They dispute, however, ONDA's statement that the cattle grazing continues to degrade the native plants and communities. Rather, BLM insists that the trend in condition of riparian habitat, which includes vegetation, is stable or upward in all publicly-owned parts of the river area. According to BLM, changes in grazing management that it is implementing this year, including reduced stocking levels, changes in season of use and pasture rotation and periodic rest, will produce an upward trend in areas that are currently stable and will accelerate the improvement in areas that already show an upward trend.

Cattle are excluded from certain parts of the river area due to topography and fencing. BLM has constructed fences to exclude cattle from certain riparian areas that were severely damaged by cattle. In fact, topography and fences largely exclude livestock from 40 of the 74.8 miles of the river corridor. ONDA submits that these exclosure areas are, nevertheless, still characterized by non-native vegetation, cut banks and a lack of willows and other woody species that would stabilize streambanks and shade water. BLM and intervenors point out that while that may have been the case five years ago, it does not reflect the current condition of exclosure areas.

Specifically, BLM offers evidence that the condition of the largest exclosure area, the 6.5 mile stretch of the mainstem of the Donner und Blitzen River above Page Springs that was closed to grazing in 1981, has improved significantly. Observations and photographic documentation made by BLM staff almost annually since 1981 have recorded improvements in streambank stability, increases in riparian shrubs and an overall upward trend in riparian habitat. Riparian recovery has been slower in this area than in others because of the frequent high water that flows down this lower section of the river. The two mile long exclosure on the Little Blitzen River, below the Riddle Brothers Ranch, has shown rapid reproduction of riparian shrubs and improvements in bank stability since livestock were fenced out in 1991.

The River Plan does not require the exclusion of cattle from any new part of the river area. ONDA contends that removal of cattle from parts of the river area and the prevention of any trespassing cattle is necessary so that certain native plants and plant communities may be restored to a natural function and may thereafter be protected and enhanced. BLM agrees that cattle should be removed from the high-elevation gorges of the river corridor; namely, Little Indian Gorge, Big Indian Gorge and Little Blitzen Gorge, where a number of sensitive plant communities are located. In fact, BLM represents that is has already excluded livestock from the Little Blitzen and Big Indian Gorges. Further, steep terrain allows only few livestock to reach Little Indian Gorge. BLM disagrees that livestock should be removed

from other parts of the river because research has shown that, if livestock are carefully managed, riparian plant communities can be restored without completely eliminating grazing.

ONDA submits that the scientists are concerned particularly with removing cattle and taking other measures in order to restore natural wet meadows within a "very threatened ecosystem type" along the Little Blitzen River. BLM disagrees with this statement because it suggests that the Nature Conservancy report stated that there are natural wet meadows along the Little Blitzen River that are "very threatened" by grazing. BLM informs that the Nature Conservancy report actually stated that, if BLM eliminated irrigation and grazing in the existing man-made meadows along the Little Blitzen, some natural wet meadows "should remain," and these, in combination with the willows, cottonwoods and alders expected to spread through the Little Blitzen bottom lands, would be "an excellent example of an ecosystem type which has been almost entirely eliminated in the northern Great Basin."

To address the impact of cattle on river values, the River Plan states as a management "objective" improving "trend in riparian condition." ONDA states that the trend standard fails to restore, protect or enhance certain native plants and plant communities in the river area. BLM and intervenors take exception to this assessment because the affidavit cited in support of this assertion is stated in general, hypothetical terms and does not identify any particular plant species or plant community that is native to the Donner und Blitzen River area that is located in parts of the river where livestock normally graze and that would not be likely to improve under a "trend" standard.

BLM defines "trend in range condition" as meaning a movement toward or away from the "climax or potential natural community." BLM considers the indicators of trend in riparian condition to include: 1) increase in ground cover; 2) composition changes in herbaceous species; 3) establishment or increase in woody species; 4) changes in streambank stability; and 5) changes in stream depth and width. BLM classifies riparian condition as "poor," "fair," "good," or "excellent," depending on several criteria, including: 1) percent of the stream that is shaded; 2) vegetation species composition, vigor and abundance; and stability of streambanks.

The River Plan states as a management "action" that grazing will not exceed in riparian areas 45 percent utilization of herbaceous plants and 20 percent utilization of woody plants. ONDA asserts that certain herbaceous plants that are components of the vegetation value of the river area may not thrive or reproduce under the utilization standard. Similarly, ONDA claims that certain woody plants in riparian areas cannot thrive or reproduce well under the utilization standard. BLM and intervenors dispute these two assertions and argue that the extent to which any particular utilization standard may permit vegetation to thrive cannot be assessed independently of other components of a grazing system, such as rest periods and season of use. BLM explains that the River Plan does not purport to detail the grazing systems for the allotments around the Donner und Blitzen River; rather, this subject is left to the management plans for individual allotments. Further, the South Steens Allotment Management Plan provides for an early season of use for the pasture surrounding the South Fork of the Blitzen, with a year of rest every four years.

The river area provides habitat for certain resident fish species that rely on cold and clean water, including wild redband trout. ONDA informs that the health of fish is linked to water quality and the health of riparian vegetation, especially woody species. Although BLM agrees with this statement, Harney County disputes that statement and offers that the Nature Conservancy report stated instead that "[c]loser monitoring of the redband trout fishery is recommended on a species basis as it is a valuable indicator of the health of the system as well as being a rare species." In 1991 and 1992, BLM conducted an "aquatic habitat survey" of 40 of the river area's 74.8 miles. Forty-five percent of the surveyed habitat was in "poor" or "fair" condition. BLM agrees with this statement, but Harney County presents that the aquatic habitat surveys in 1991 and 1992

found thirty-six percent of the surveyed habitat was in "poor" or "fair" condition and that sixty-four percent was in "good" or "excellent" condition.

Water quality is also degraded in the river area. ONDA submits that the Oregon Department of Environmental Quality found that the Little Blitzen River is "water quality limited," because it exceeds the state temperature standard. BLM presents that the Oregon Department of Environmental Quality has not found that the Little Blitzen River is "water quality limited." Rather, the Oregon Department of Environmental Quality has proposed listing the Little Blitzen River as "water quality limited" for temperature, in a draft list that has been issued for public comment.

ONDA maintains that the River Plan states no management standard for fish based on instream conditions. Rather, it iterates the forage utilization and condition trend standards. BLM agrees, but adds that improvement in riparian conditions, including vegetation, shading and streambank stability, should improve instream conditions, such as pool frequency and depth, sedimentation and temperature. BLM adds that its analysis of monitoring data on instream conditions, collected in 1994 and 1995, indicates that the condition of stream habitat on the South Fork of the Blitzen had improved along 7.3 miles, or seventy percent, of that river segment, compared with conditions in 1991. According to BLM, this improvement occurred in the parts of the South Fork that were in the worst condition in 1991.

BLM's monitoring data included observations of riparian vegetation, flow patterns, stream gradient, temperature, bank stability, channel stability, pool quantity and quality, riffles and rapids, bottom materials, embeddedness, spawning areas and stream structure diversity. ONDA insists that these standards will not restore, protect or enhance certain woody species necessary to stabilize streambanks and shade water for fish. BLM disagrees because the extent to which a utilization standard may permit vegetation to thrive cannot be assessed independently of other components of a grazing system, such as rest periods and season of use.

Further, BLM challenges ONDA's affidavit on this matter because it does not address whether "condition trend" standards are an effective means of restoring woody riparian species.

The River Plan will allow motorized vehicles to operate in more than seven miles inside the river area. ONDA informs that BLM plans to improve two primitive secondary access roads not usually frequented by the general public and make them high standard gravel roads. BLM responds that the River Plan calls for improvement of only one primitive road: The access road that leads from the Steens Mountain Loop Road to the Riddle Brothers Ranch. That access road is approximately two miles long and about half of it is outside the river corridor. BLM also plans to construct two new parking lots in the river area. ONDA claims access by and use of motorized vehicles in the river area will harm its recreational and scenic values, particularly its aesthetic beauty and solitude. BLM challenges that assertion on the basis that the River Plan will allow motor vehicle access only in some parts of the river area where motor vehicles had access prior to designation of the river under the WSRA. The River Plan closes one mile of existing road within the river corridor to motor vehicles and closes 17 miles of the river corridor to mountain bikes and other mechanized equipment.

## DISCUSSION

## I. CHALLENGES TO JURISDICTION

As a preliminary matter, the court must resolve two procedural challenges raised by defendant-intervenors; namely, standing and exhaustion. Harney County contends ONDA has failed to satisfy the "injury-in-fact" element of standing. Also, both defendant-intervenors—Harney County and the Nymans/Rex Clemens Ranch, Inc.—make a single conclusory statement in their briefs that ONDA failed to exhaust its administrative remedies. The court will address those challenges in turn.

### A. Standing

■ Harney County contends ONDA has failed to satisfy the "injury-in-fact" element

of standing. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). Harney County claims ONDA did not provide specific facts showing that it sustained a particularized injury as a result of BLM's River Plan EA's finding that the proposed actions would not significantly affect the human environment. According to Harney County, ONDA cannot demonstrate such an injury here because the proposed action is to maintain the status quo.

In *Lujan,* the Supreme Court set forth a three-part test to determine whether standing is conferred. *Id.* at 560–61, 112 S.Ct. at 2136–37. At issue in this case is part one of the test: whether plaintiff "suffered an 'injury in fact'—an invasion of a legally-protected interest which is (a) concrete and particularized ... and (b) 'actual or imminent,' not 'conjectural or hypothetical.'" *Id.* at 560, 112 S.Ct. at 2136 (internal citations omitted).

Here, ONDA alleged injuries caused directly by BLM's failure to comply with the procedures required by NEPA and the procedural and substantive requirements of the WSRA. ONDA argues that injury resulted from BLM's procedural violation of NEPA. Specifically, ONDA was deprived of its right to be fully apprised of the impacts of grazing and developments in the river area and to meaningful participate in BLM decision making when BLM prepared only an EA and issued a finding of no significant impact. BLM's failure to prepare an environmental impact statement resulted in livestock grazing and other activities throughout the river area that allegedly degrade the values for which individuals use and enjoy the river. Accordingly, ONDA satisfies the standing test set forth in *Lujan. Salmon River Concerned Citizens v. Robertson,* 32 F.3d 1346, 1354–55 (9th Cir.1994) ("The asserted injury is that environmental consequences might be overlooked, as a result of deficiencies in the government's analysis under environmental statutes." (quotations omitted)).

### B. Exhaustion of Administrative Remedies

Both defendant-intervenors—Harney County and the Nymans/Rex Clemens Ranch, Inc.—make a single conclusory statement in their briefs that ONDA failed to exhaust its administrative remedies. Neither intervenor sets forth any legal support or analysis for their respective conclusions. Normally, the court should dismiss such a conclusory statement as inadequate, standing alone, to either prevail on summary judgment or to defeat a motion for summary judgment. The requirement of exhaustion relates, however, to the court's subject matter jurisdiction and, therefore, the court must determine whether exhaustion was excused in this case.

ONDA acknowledges that it has appealed the River Plan to the Interior Board of Land Appeals ("IBLA") and that appeal is pending. Nevertheless it argues that no further exhaustion is required because: 1) no administrative remedy exists, 2) the Department of Interior's appeal rules are inadequate under the APA to require exhaustion, and 3) any exhaustion is futile. The court agrees with ONDA that the Department of Interior's appeal rules are inadequate under the APA to require exhaustion. Thus, the court need not reach the other arguments raised by ONDA to excuse the exhaustion requirement.

Under the APA, judicial review of an agency's action is available when the challenged action is "final." 5 U.S.C. § 704. Under section 10(c), an action is final and subject to judicial review when the aggrieved party has exhausted all administrative remedies expressly prescribed by statute or agency rule. *Id.; Darby v. Cisneros,* 509 U.S. 137, 154, 113 S.Ct. 2539, 2548, 125 L.Ed.2d 113 (1992). The requirement that an aggrieved party exhaust administrative remedies, therefore, is limited to that which the statute or rule clearly mandates. *Id.* Further, in the event an agency rule requires appeal before review, the agency rule must also provide that the administrative action is made inoperative pending that review. *Id.*

Here, the Department of Interior regulations do require exhaustion, 43 C.F.R. § 4.21(c), but the regulation does not render the River Plan inoperative pending IBLA review. 43 C.F.R. § 4.21(b). Rather, the aggrieved party is required to request a stay and make a compelling threshold showing to

justify the stay. This process vests discretion in the IBLA to grant or deny a stay pending review. The requirement under the APA is unequivocal. As such, ONDA was not required to proceed with its appeal to the IBLA prior to seeking judicial review of the River Plan.

## II. STANDARD OF REVIEW

■ The court's review of a final agency action is governed by the standard set forth in section 10(e) of the APA. 5 U.S.C. § 706(2)(A). Section 10(e) of the APA provides that the reviewing court shall "hold unlawful and set aside agency action ... found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Deference is given to the administrative agency and there is a presumption that the agency's decisions are valid. *EPA v. National Crushed Stone Ass'n*, 449 U.S. 64, 83, 101 S.Ct. 295, 307, 66 L.Ed.2d 268 (1980).

■ The court may not substitute its judgment for that of the administrative agency. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983). The proper function of the court is to determine whether the administrative agency has "considered relevant factors and articulated a rational connection between the facts found and the choices made." *Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 105, 103 S.Ct. 2246, 2256, 76 L.Ed.2d 437 (1983).

In *Chevron, U.S.A., Inc., v. Natural Resources Defense Council, Inc.* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the United States Supreme Court discussed in detail the proper manner in which courts review an agency's construction of a statute which it is obligated to administer.

When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Id.* at 843, 104 S.Ct. at 2781–82.

## III. LEGAL STANDARDS

### A. Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The materiality of a fact is determined by the substantive law on the issue. *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987). The authenticity of a dispute is determined by whether the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). If the moving party shows the absence of a genuine issue of material fact, the non-moving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324, 106 S.Ct. at 2553.

Special rules of construction apply to evaluating summary judgment motions: (1) all reasonable doubts as to the existence of genuine issues of material fact should be resolved against the moving party; and (2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. *T.W. Elec.*, 809 F.2d at 630–31.

## B. Permanent Injunction

■ Upon finding a violation of NEPA or the WSRA, the court must consider the balance of irreparable harm and the public interest in deciding whether to issue a permanent injunction. *Amoco Production Co. v. Village of Gambell*, 480 U.S. 531, 544, 107 S.Ct. 1396, 1403–04, 94 L.Ed.2d 542 (1987); *accord Northern Cheyenne Tribe v. Hodel* 851 F.2d 1152, 1156 (9th Cir.1988).

■ When considering whether an injunction should issue, the court must assume that "environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable." *Amoco Production Co.*, 480 U.S. at 545, 107 S.Ct. at 1404. Consequently, where a plaintiff has shown that environmental injury is "sufficiently likely, the balance of the harms will usually favor the issuance of an injunction to protect the environment." *Id.*

## IV. VIOLATIONS UNDER THE WSRA

ONDA seeks an order from the court declaring that the River Plan BLM prepared for the Donner und Blitzen Wild and Scenic River violates the WSRA, 16 U.S.C. §§ 1271–1287.

> The WSRA was enacted, in part, so that: certain selected rivers of the Nation which, with their immediate environments, possess outstandingly remarkable scenic, recreational, geologic, fish and wildlife, historic, cultural, or other similar values, shall be preserved in free-flowing condition, and that they and their immediate environments shall be protected for the benefit and enjoyment of present and future generations.

16 U.S.C. § 1271 (1985). The National Wild and Scenic Rivers System ("System") was created to implement this policy. The WSRA designated the original rivers to be included in the System and set forth two methods through which additional rivers become a part of the System. Specifically, rivers become a part of the System either by an Act of Congress, *id.* at § 1273(a)(i), or by state action with the approval of the Secretary of the Interior, *id.* at § 1273(a)(ii).

For each river designated after 1985, the federal agency charged with managing the designated river is required to prepare a comprehensive management plan "for such river segment to provide for the protection of the river values." 16 U.S.C. § 1274(d)(1) (West Supp.1996). The plan must address "resource protection, development of land and facilities, user capacities, and other management practices necessary or desirable to achieve the purposes of this chapter." *Id.*

Section 1281(a) sets forth the management duties of the federal agency charged with managing the designated river. Section 1281(a) requires that:

> Each component of the national wild and scenic rivers system shall be administered in such manner as to protect and enhance the values which caused it to be included in said system without, insofar as is consistent therewith, limiting other uses that do not substantially interfere with public use and enjoyment of these values. In such administration primary emphasis shall be given to protecting its esthetic, scenic, historic, archaeologic, and scientific features. Management plans for any such component may establish varying degrees of intensity for its protection and development, based on the special attributes of the area.

16 U.S.C. § 1281.

In 1988, the Donner und Blitzen was designated by Congress as a component of the System. *Id.* at § 1274(a)(74). Significantly, when Congress designated the Donner und Blitzen it classified the river, including its major tributaries, as a "wild" river. *Id.* Under the WSRA, a "wild" river is defined as "[t]hose rivers free of impoundments and generally inaccessible except by trail, with watersheds or shorelines essentially primitive and waters unpolluted. These represent vestiges or primitive America." *Id.* at § 1273(b)(1). The classification "wild" is the most restrictive of the three possible classifications. *Id.* at § 1273(b) (Each river included in the System must be classified, designated and administered as either "wild", "scenic" or "recreational".).

ONDA argues that BLM violated the WSRA by adopting, without any rational ba-

sis, a management plan for the river that fails to protect and enhance native plants, plant communities and fisheries. Specifically, ONDA insists there are four aspects of the River Plan that violate the WSRA. Namely, the River Plan improperly authorizes the: 1) continued grazing of cattle, 2) construction of new parking lots, 3) the improvement of a secondary access road, and 4) implementation of a water resource project to divert water to irrigate hay fields.

### A. BLM Failed To Adequately Consider Excluding Cattle From The River Area

ONDA submits that BLM had an affirmative duty under the WSRA and NEPA to fully consider, disclose and analyze whether excluding cattle grazing from all or part of the public lands in the river area was necessary to restore, protect and enhance the values of the Donner und Blitzen River. According to ONDA, BLM failed to meet this duty in preparing the River Plan and the EA because it: 1) erroneously concluded that it did not have authority under the WSRA to exclude cattle from public lands in the river area, and 2) erroneously concluded that the River Plan could not affect activities allowed under pre-existing programmatic plans for the river area.

BLM does not dispute that it had authority to exclude cattle grazing from the river area. Further, it insists that the River Plan does not presume that BLM lacked authority to exclude livestock from the river area. In fact, BLM refers the court to the following portion of the River Plan: "Grazing management changes will be implemented to protect and enhance the outstandingly remarkable values of the Wild and Scenic River System. This will require fencing, development and protection of alternative water sources, or elimination of livestock grazing." The River Plan also describes the segments of the river totaling 40 miles of the 74.8 mile river corridor that already have been excluded from grazing.

Both Harney County and the Nymans' maintain, however, that Congress intended existing livestock grazing, as well as other commercial uses, to continue in designated wild and scenic river areas. Specifically, they argue that the OOWSRA was designed to "maintain the status quo and specifically recognized that existing uses and facilities were 'grandfathered' under the [OOWSRA] and were not required to be extracted from the river corridor." Harney County relies extensively on the legislative history of both the WSRA and the OOWSRA to argue that those statutes are intended to preserve and protect the outstandingly remarkable features of the designated rivers by maintaining the existing character and status quo of the rivers at the time of designation.

The court agrees with ONDA and the BLM that the BLM had authority to exclude cattle grazing from the river area. The plain language of the statute mandates that the federal agency administer the river in such a manner as "to protect and enhance the values which caused it to be included in said system without, insofar as is consistent therewith, limiting other uses that do not substantially interfere with public use and enjoyment of these values." 16 U.S.C. § 1281(a). Absent ambiguity or an absurd result, the plain meaning of the statute must control. In addition, the court is able to discern from other federal statutes that Congress is cognizant of its ability to grandfather specific commercial uses of a wild and scenic river that might otherwise be prohibited by the WSRA. See, e.g., 16 U.S.C. §§ 1274(a)(17), (a)(18), (a)(22), (a)(24) and (a)(53).

Moreover, the legislative history relied on by the intervenors is unpersuasive. The legislative history consists primarily of statements made by individual legislators during the hearings on the OOWSRA. The OOWSRA simply designated the Donner und Blitzen, classified it as "wild" and established its length by river mile. The OOWSRA did not alter any substantive provision of the WSRA. This does not mean, however, that cattle grazing must be excluded from the river area. Rather, cattle grazing may continue, but only in accordance within the strictures of the WSRA to protect and enhance.

Here, BLM contends that it was required to restrict grazing only where grazing

would "substantially interfere" with the public's enjoyment of river values. According to BLM, because the WSRA does not define "substantially interfere," it is left to its judgment to determine whether grazing is compatible with protection and enhancement of river values. BLM determined that livestock should be excluded from some parts of the river, but that grazing in other parts of the river would not "substantially interfere" with the public's enjoyment of river values. BLM determined that it is possible to protect and enhance river values and allow grazing to continue in some areas on a managed schedule. As such, BLM insists that the court must defer to its judgment. *See Motor Vehicle Mfrs. Ass'n.*, 463 U.S. at 43, 103 S.Ct. at 2866–67 (The court may not substitute its judgment for that of the administrative agency.).

The court disagrees with BLM's assertion that the River Plan strikes the appropriate balance between continued grazing and protecting and enhancing the river values. The River Plan identifies seven outstandingly remarkable values: scenic, geologic, recreational, fish and wildlife, vegetation, cultural—traditional practices/prehistoric, cultural—historic. The record in this case establishes that several of these values are being degraded by continued cattle grazing in the river area.

The *Final Report* prepared by the five botanists in cooperation with BLM, included the following Management Recommendation for grazing in the river area:

> Grazing has had a broad scale affect upon the riparian and upland vegetation in the Blitzen River System. Nearly every reach of every river segment had been grazed this year, some of which was obvious trespass. The South Fork Blitzen River was so heavily grazed that the riparian had been essentially destroyed over a significant part of the segment. In contrast, in most of the upper reaches of the glacial canyons of the Blitzen River system the riparian was essentially intact and in good condition. The detrimental effects of grazing in riparian systems is well documented and the Blitzen River system exhibits the usual effects. Of greatest concern to the

surveyors was the general lack of reproduction in black cottonwood and willow stands. *Our unanimous recommendation is to remove grazing from the entire river corridor and to effectively prevent trespass from nearby allotments.*

*Final Report Donner Und Blitzen Wild & Scenic River Sensitive Plants And Unique Natural Areas Inventory* (emphasis added).

In addition, nearly half of the surveyed aquatic habitat remains in a "poor" or "fair" condition due to poor water quality and riparian vegetation. It is undisputed that the health of the coldwater fish in the river area is linked to the vitality of water and vegetation. Further evidence of the declining water quality was delivered on June 26, 1996. The Environmental Protection Agency issued a final decision approving the State of Oregon's finding that two of the major streams in the river area are "water quality limited" under the federal Clean Water Act, on the ground that the water temperature exceeds the allowable maximum standard established for the protection of the native fish. The BLM does not challenge ONDA's assertion that the primary cause of the overheated water and siltation in the river is "denuded and collapsed streambanks due to grazing."

The record also reflects that cattle grazing has damaged native plants and plant communities and the standards set forth in the River Plan are not adequate to ensure the restoration of those values. ONDA submits the testimony of Carolyn Wright, one of the five botanists involved in preparing the *Final Report* for BLM, and Dr. Joy Belsky, an ecologist for the Oregon Natural Resources Council. In Ms. Wright's view:

> those areas which are identified in the Preferred Alternative to continue to be grazed are also those areas which have the most degraded conditions, and were generally rated as poor to fair condition for all resources.... Continued livestock use will continue to encourage the unbalance in the plant communities, favoring those species which are unpalatable to cattle at the expense of those which are highly palatable.

In her declaration, Ms. Wright elaborates on specific native plants in the river areas that the standards set by BLM will not protect.

In Dr. Belsky's view the utilization standards set forth by the River Plan for herbaceous species and woody species will not succeed. Specifically, Dr. Belsky states:

> [W]here livestock are allowed to remain in an area because they have not been shown to exceed the 45 percent level, they will eat virtually every individual of their preferred food species that they encounter.... Livestock will thus effectively eliminate some species from the plant community.

> . . . . .

> [A]lthough 45 percent herbaceous and 20 percent woody species utilization may not harm species in good or better condition, the levels are patently excessive for plants in poor or fair condition. The degraded riparian areas in the watershed must be restored to full productive capacity in order to recover in a timely manner. Allowing livestock to consume, browse, rub, or trample plants in communities in poor or fair condition while they are in sub-optimal condition can lead to overuse within days and set recovery back twenty years or more.

It also appears from the record that at the time BLM prepared the River Plan it did not believe it had authority to exclude cattle grazing entirely from the river area. Further, it appears from the record that BLM relied on the Andrews Management Framework Plan, written well before the Donner und Blitzen was designated a part of the System as a "wild" river, to determine the impact of cattle grazing in the river area for purposes of the River Plan. While BLM was permitted to coordinate and incorporate the River Plan into other resource management plans for affected adjacent Federal lands, 16 U.S.C. § 1274(d)(1), those existing plans do not simply excuse the agency's duties under the WSRA.

The River Plan BLM prepared for the Donner und Blitzen River violates the substantive requirements of the WSRA.

## V. VIOLATIONS UNDER NEPA

ONDA argues that BLM was required to prepare an environmental impact statement ("EIS") for the River Plan because grazing, parking lots, improved roads and water diversions may all have a significant impact on the river area. ONDA also challenges the EA prepared for the River Plan. ONDA charges that the EA for the River Plan is inadequate under NEPA because it fails to analyze a reasonable and available alternative and it fails to disclose the environmental impact of alternatives that it considers.

NEPA requires that for all "major Federal actions significantly affecting the quality of the human environment," a detailed statement must be prepared to analyze the environmental impact of the proposed action, adverse environmental effects that cannot be avoided, and alternatives to the proposed action. 42 U.S.C. § 4332(2)(c). The Council on Environmental Quality ("CEQ") promulgated regulations to implement the requirements and objectives of NEPA and to provide agencies specific guidelines for complying with NEPA. *See* 40 C.F.R. §§ 1500–1508.

The CEQ regulations govern whether an agency must prepare an EIS. 40 C.F.R. § 1501.4. An agency must first prepare an EA that is used to determine whether the agency should then prepare a more detailed EIS or issue a finding of no significant impact ("FONSI"). An EA is defined as a "concise public document" that "[b]riefly provide[s] sufficient evidence for determining whether to prepare" an EIS. 40 C.F.R. § 1508.9(a).

 Review of an agency's determination to adopt a FONSI instead of preparing an EIS is governed by the arbitrary and capricious standard. This standard requires the reviewing court to ensure that an agency has taken the requisite "hard look" at the environmental consequences of its proposed action. The court must carefully review the record to ascertain whether the agency decision is "founded on a reasoned evaluation of the relevant factors." *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 378, 109 S.Ct. 1851, 1861, 104 L.Ed.2d 377 (1989). "When specialists express conflicting views,

an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Id.* at 378, 109 S.Ct. at 1861.

■ Ninth Circuit law dictates that an agency must prepare an EIS if "substantial questions are raised as to whether a project ... may cause significant degradation of some human environmental factor." *LaFlamme v. FERC*, 852 F.2d 389, 397 (9th Cir.1988) (internal quotations omitted). "The plaintiff need not show that significant effects will in fact occur, but if the plaintiff raises substantial questions whether a project may have a significant effect, an EIS must be prepared." *Id.*

■ As a threshold matter, relying on *National Wildlife Federation v. Espy*, 45 F.3d 1337 (9th Cir.1995), BLM and the intervenors assert that an EIS was not required because livestock grazing in the Donner und Blitzen river area is the status quo, and an EIS is not required for an agency's continued management activities that have been in existence for many years. Further, BLM offers that the proposed action is not to continue grazing, but to take measures to protect the River's "outstandingly remarkable values." As such, BLM contends that NEPA documentation is not required to examine the beneficial impacts of its actions. *See Douglas County v. Babbitt*, 48 F.3d 1495, 1505 (9th Cir.1995) (Court held that NEPA procedures did not apply to an agencies' designation of critical habitat under the Endangered Species Act.), *cert. denied,* —— U.S. ——, 116 S.Ct. 698, 133 L.Ed.2d 655 (1996).

The court does not agree that the BLM's decision to continue cattle grazing was simply "a phase in an essentially continuous activity," *see Confederated Tribes And Bands v. F.E.R.C.*, 746 F.2d 466, 475 (9th Cir.1984), nor is it a decision that will not "alter the natural physical environment." *Compare Douglas County*, 48 F.3d 1495. The WSRA sets forth affirmative duties on the part of federal agencies charged with managing rivers in the System. The River Plan here purports to authorize cattle grazing in accordance with the strictures of the WSRA; that involves distinctly different considerations

from prior decisions to allow grazing. Once the Donner und Blitzen became a component of the WSRA System, intervening duties were imposed on the agency's decision-making process with respect to management activities. The WSRA mandated that BLM prepare a comprehensive management plan to protect and enhance the outstandingly remarkable values of the Donner und Blitzen River. The decisions of BLM, implemented by the River Plan, to authorize continued cattle grazing, the construction of parking lots, the improvement of roads and water development is more than merely continuing activities.

■ Next, BLM and the intervenors argue that any "details of management actions" with respect to cattle grazing that are omitted in the River Plan EA are covered in the South Steens Allotment Management Plan ("AMP") EA and the Andrews Resource Area Management Framework Plan ("MFP") EA. BLM contends that the AMP EA is tiered to the River Plan EA and, thus, the court must review its NEPA compliance as a whole and not confine its review to the River Plan EA.

The Andrews Resource Area MFP was a general plan written 14 years ago. The MFP covers over a million and a half acres of public lands around the river area, of which 22,265 acres constitute the river area. The MFP's express purpose was to analyze and implement a livestock grazing program under the Federal Land Management and Policy Act ("FLMPA") and, understandably, it makes no mention of the WSRA. The MFP contains no site-specific information concerning the impact of grazing on the protected values within the river area. Further, BLM does not provide any legal authority for its attempt to tier the South Steens' AMP EA to the River Plan EA. The regulations provide only that a subsequent site-specific EA may be tiered to an earlier programmatic EIS, under certain circumstances. *See* 40 C.F.R. §§ 1502.20, 1508.28. In addition, tiering is used to eliminate repetitive discussions of the same issues. Thus, subsequent documents incorporate by reference the broader state-

ments and then focus on the issues specific to the subsequent action. *Id.*

■ Finally, relying on *Greenpeace Action v. Franklin,* 14 F.3d 1324 (9th Cir.1992), BLM argues that it was not required to prepare an EIS simply because qualified experts disagree on the impacts of the proposed action. *Id.* at 1333. BLM contends that it commissioned the *Final Report* only to obtain an accurate botanical inventory of sensitive plants and unique natural areas within the river area. It did not request the report to aid in its determination of whether to allow grazing. Rather, BLM relies on the declarations of Guy R. Sheeter and James G. Buchanan, both wildlife biologists employed by BLM, in support of its decision to continue cattle grazing in the river area. Further, BLM submits that Dick Vander Schaaf, the author of the *Final Report,* subsequently indicated that his goal for the river area was "considerably less than total exclusion of cattle from the River Plan corridor."

The declarations submitted by BLM do not contradict or even dispute the evidence submitted by ONDA in support of its claim that substantial questions are raised concerning whether the activities authorized by the River Plan may have a significant impact on the environment. The scientific data in the record unequivocally indicates that grazing in the river area may significantly degrade protected river values, yet no EIS was prepared. In contrast, the River Plan does not require the exclusion of cattle from any new part of the river area. The court concludes that the BLM's decision to allow grazing was not "founded on a reasoned evaluation of the relevant factors."

In light of the uncontroverted scientific evidence, BLM violated NEPA when it failed to prepare an EIS to analyze the impacts of grazing in the river area.

## VI. ROADS AND PARKING LOTS

■ ONDA also challenges the River Plan on the ground it illegally allows motorized vehicles to operate in more than seven miles inside the river area. In addition, BLM plans to build two "high standard gravel roads" along "primitive secondary access roads not usually frequented by the general public." BLM also plans to build two new parking lots in the river area. ONDA insists that these BLM decisions that improve and increase vehicle access within the river area violates the WSRA and NEPA.

As stated above, Congress defined "wild" rivers as "free of impoundments and generally inaccessible except by trail." 16 U.S.C. § 1273(b)(1). Section 1283(a) directs that the agency charged with managing the river pay "particular attention ... to ... road construction." In fact, federal regulations authorize BLM to close roads, if necessary, to comply with the WSRA. *See* 43 C.F.R. § 8351.2–1(a).

In spite of its express duties under the WSRA, BLM authorized the construction of new parking lots and the improvement of primitive roads within the river area without preparing an EIS to consider the impacts of the increased access and use on the river values of the Donner und Blitzen River. In addition, it appears BLM failed to consider, much less analyze, whether such new development would violate the WSRA. The court is unable to determine based on the administrative record before it that BLM has taken the requisite "hard look" at the environmental consequences of its proposed action in violation the requirements of NEPA.

■ BLM insists that ONDA's claims regarding motorized vehicles in the river area are barred by res judicata. Specifically, BLM contends that ONDA is attempting to relitigate an action brought in this court last year that was dismissed with prejudice. *See Oregon Natural Desert Assoc. v. Dombeck,* CV No. 95–276–HA (D.Or.1995). *Dombeck* was a challenge to the June 1993, Andrews Plan Amendment and its Road EA. ONDA contended that the Road EA was inadequate under NEPA in several respects. ONDA also challenged the Plan Amendment under the FLMPA. The Court granted Dombeck, et al.'s Motion For Summary Judgment and the matter was dismissed with prejudice.

According to BLM, the *Dombeck* action afforded ONDA full and fair opportunity to litigate all aspects of the Road EA and the Andrews Plan. Further, BLM informs that the publication of the Final River Plan EA

put ONDA on notice that it was the Road EA decision and not the River Plan EA decision that governed BLM's management of roads in the disputed area. The Final River Plan EA stated: "The recommendation to maintain approximately 7.25 miles of secondary roads is not part of this Proposed Plan. Secondary roads will be addressed in the Andrews Resource Area Management Framework Plan amendment and environmental assessment."

The River Plan decision and the Andrews Plan Amendment decision were published about two months apart, and almost two years before the complaint was filed in *Dombeck*. BLM maintains that ONDA could have raised all of its current objections to the maintenance of roads in the river area and to the building of the parking lots on the Riddle Ranch in that complaint. While ONDA did challenge the proposed construction in that complaint, they did not make a challenge under the WSRA for obliterating roads from the river area. BLM concludes that, nevertheless, under the principles of res judicata, ONDA may not litigate any road issues in the present action, including its claim pursuant to the WSRA.

ONDA insists that none of its claims are barred by res judicata because: 1) its challenge to parking lots and roads in the river area could not have been resolved in *Dombeck;* and 2) no privity exists between all plaintiffs in *Dombeck* and this case.

To assert the doctrine of res judicata, the moving party must establish that a claim in a subsequent action "relates to the same primary right as a claim in a prior action, the prior judgment was final and on the merits, and the plaintiff was a party or in privity with a party in the prior action." *Sanchez v. City of Santa Ana,* 936 F.2d 1027, 1035–36 (9th Cir.1990) (quotations omitted), *cert. denied,* 502 U.S. 957, 112 S.Ct. 417, 116 L.Ed.2d 437 (1991).

Without deciding whether the other requirements for asserting res judicata have been satisfied, BLM has failed to meet its burden to establish that plaintiffs here were in privity with the plaintiffs in *Dombeck*. BLM does not submit any evidence that the seven named plaintiffs in this case that were not parties to the action in *Dombeck* had any control over the plaintiffs in *Dombeck,* nor any interest in the subject of that lawsuit. The court is not able to find privity merely on the basis that all the plaintiffs are environmental groups. The fact that the various environmental groups in this action may share some common interests does not amount to a privity relationship by which all plaintiffs can be deemed to have had an opportunity to be heard in the *Dombeck* action. Accordingly, summary judgment is granted in favor of ONDA on its claims that BLM's decisions to improve and increase vehicle access within the river area by constructing new parking lots and improving existing roads without first considering the impacts violated the WSRA and NEPA.

### CONCLUSION

Based on the foregoing, ONDA's Motion For Summary Judgment (doc. # 23) on the grounds that: 1) the River Plan BLM prepared for the Donner und Blitzen Wild and Scenic River violates the Wild and Scenic Rivers Act, 16 U.S.C. §§ 1271–1287; and 2) BLM violated the National Environmental Policy Act by failing to prepare an environmental impact statement to analyze the cumulative impacts of similar and connected actions in the river area is **GRANTED.**

It is further ordered that the parties submit a stipulated permanent injunction to the court no later than March 4, 1997. If the parties are unable to agree on the scope and terms of the permanent injunction the parties shall submit their respective proposed permanent injunction and the court will determine the scope and terms of the permanent injunction. All other motions are **DENIED** as moot.

IT IS SO ORDERED.