NATIONAL WILDLIFE FEDERATION; Oregon Natural Desert Association; Northwest Rafters' Association; The Native Fish Society, Plaintiffs,

v.

Harry R. COSGRIFFE, Central Oregon Resource Area Manager, Bureau of Land Management; Bureau of Land Management, an agency of the U.S. Department of the Interior; Bruce Babbitt, the Secretary of the U.S. Department of the Interior, Defendants.

No. CV-97-853-ST.

United States District Court, D. Oregon.

Aug. 6, 1998.

Peter MK Frost, National Wildlife Federation, Portland, OR, Thomas M. France, National Wildlife Federation, Missoula, MT, R. Nicole Cordan, National Wildlife Federation, Portland, OR, for Plaintiffs.

Thomas C. Lee, U.S. Attorneys Office, Portland, OR, for Defendants.

## OPINION

STEWART, United States Magistrate Judge.

### *INTRODUCTION*

Plaintiffs, who are several environmental and recreational organizations, bring this action to compel defendants, Harry R. Cosgriffe, Central Oregon Resource Area Manager of the Bureau of Land Management, the Bureau of Land Management, and Secretary of the Interior Bruce Babbitt (collectively referred to as "BLM"), to prepare a river plan and an environmental impact statement ("EIS") for the areas of the John Day River and South Fork of the John Day River (collectively "John Day WSRs") that have been designated under the Wild and Scenic River Act of 1968 ("WSRA"), 16 USC §§ 1271–1284. Plaintiffs allege that by failing to produce a river plan and an EIS, the BLM has violated the WSRA and the National Environmental Policy Act of 1972 ("NEPA"), 42 USC §§ 4321–4370d. All parties have consented to allow a Magistrate Judge to enter final orders and judgment in this case in accordance with FRCP 73 and 28 USC § 636(c).

Now before this court are plaintiffs' motion for summary judgment as to Counts One, Two, Five, Six, Seven and Nine and injunctive relief (docket # 22) and the BLM's motion to dismiss (docket # 36). For the reasons set forth below, both motions are granted in part and denied in part. In addition, plaintiffs' oral motion to voluntarily dismiss Counts Three, Four, and Eight is granted.

## UNDISPUTED FACTS

The John Day River in Oregon, which includes a main stem and three forks, consists of over 500 river miles with no major dams, making it the longest unimpounded river in the Columbia River Basin. The John Day River system drains nearly 8,100 square miles of an interior plateau that lies between the Cascade and Blue Mountain Ranges. It is one of the most important river systems in the Columbia River Basin for wild salmon, especially spring chinook and winter steelhead. The genetic integrity of these wild salmon runs is enhanced because there are no fish hatcheries in the Basin.

In 1984 and 1985, the BLM prepared EISs in conjunction with the development of its John Day and Two Rivers resource management plans. The BLM prepared the resource management plans in compliance with the Federal Land and Policy Management Act, 43 USC §§ 1701–1784. The EISs analyzed the impacts of grazing on public lands throughout the John Day River Basin.

In 1988, Congress enacted the Oregon Omnibus Wild and Scenic Rivers Act ("the 1988 Act"), PubL No 100–557, 102 Stat 2782 (1988) (codified as amended 16 USC §§ 1271–1284). The 1988 Act added 147.5 miles of the main stem of the John Day River and 47 miles of the South Fork of the John Day River as components of the federal wild and scenic rivers system. 16 USC § 1274(a)(79) & (a)(101). Specifically, both rivers were designated as "recreational" rivers, which are "[t]hose rivers or sections of rivers that are readily accessible by road or railroad, that may have some development along their shorelines, and that may have undergone some impoundment or diversion in the past." 16 USC § 1273(b)(3).

The BLM administers the public land portion of the John Day WSRs, comprising roughly 26,690 acres for the main stem John Day WSR and comprising roughly 4,800 acres for the South Fork WSR, or, respectively, 42% and 29% of the lands within the interim river areas.[1] The BLM must admin-

ister the rivers primarily to "protect and enhance" their "outstandingly remarkable" values. 16 USC § 1281(a). Currently, the BLM administers 58 livestock allotments on the public lands adjacent to the John Day WSRs. The BLM has evaluated most but not all of the riparian lands within these allotments. The BLM has categorized some riparian lands within the allotments as in poor or fair condition.

The WSRA requires the BLM to establish detailed boundaries defining the river area within one year of designation of the rivers. 16 USC § 1274(b). In addition, the BLM must prepare a comprehensive management plan to provide for protection of river values. 16 USC § 1274(d). "The plan shall be prepared, after consultation with State and local governments and the interested public within 3 full fiscal years after the date of designation." *Id.*

In October 1993, almost five years after designation of the John Day WSRs, the BLM released a draft river plan and EIS. Government's Exhibit 2.

The Secretary of the Interior must enter into cooperative management agreements with affected Indian tribes where Indian treaty lands exist in association with rivers designated under the 1988 Act. PubL No 100–557, § 105(a)(2), 102 Stat 2782, 2791 (1988).[2] Part of the lower John Day River lies within the area ceded to the United States by the Confederated Tribes of the Warm Springs Reservation ("Confederated Tribes") in an 1855 treaty. 12 Stat 963 (June 25, 1855). The Secretary of the Interior has not yet entered into a cooperative management agreement with the Confederated Tribes, although the BLM is currently negotiating an agreement with them and the State of Oregon for joint development of a comprehensive management plan for the John Day WSRs.

In June 1996, the Environmental Protection Agency ("EPA") approved the State of Oregon's submission of a list of waters that are "water quality limited" under the federal

---

1. The interim river areas consist of lands uniformly within one-quarter mile from the ordinary high water mark on both sides of the rivers. 16 USC § 1275(d).

2. This section of the 1988 Act was not codified.

Clean Water Act, 33 USC § 1313(d). Parts of the John Day WSRs are water quality limited for the parameter of temperature in the summer.

Plaintiffs filed this lawsuit on June 6, 1997.

In September 1997, the BLM issued a scoping[3] notice for a draft EIS for the John Day WSRs river plan. 62 FedReg 47,832 (Sept 11, 1997).

In March 1998, the National Marine Fisheries Service proposed to list as threatened under the Endangered Species Act ("ESA"), 16 USC §§ 1531–1544, an evolutionarily significant unit ("ESU") of steelhead that includes all steelhead populations in the Middle Columbia River drainages, from Hood River to the Yakima River, excluding the Snake River. 63 FedReg 11,798 (Mar 10, 1998). This ESU includes the John Day Basin. The National Marine Fisheries Service determined that inadequate regulatory mechanisms exist to forestall the prospective listing of summer steelhead.

### DISCUSSION

Plaintiffs allege in Counts One, Two, and Five of the Amended Complaint that the BLM violated the WSRA by: (1) failing to establish detailed boundaries to define the river areas for the John Day WSRs; (2) failing to enter into cooperative management agreements and to prepare comprehensive management plans for the John Day WSRs; and (3) causing cumulative harm to the John Day WSRs' "outstandingly remarkable values" by authorizing site-specific livestock grazing and other activities on public lands in riparian areas along the rivers. In addition, plaintiffs allege in Counts Six and Seven that the BLM violated NEPA by failing to prepare an EIS to inform the public of and to provide the BLM with an evaluation of significant direct, indirect, and cumulative impacts on the John Day WSRs of such site-specific activities. Count Nine alleges viola-

tions of the Administrative Procedure Act ("APA"), 5 USC § 706(2)(A), premised on the same conduct.

Plaintiffs request that this court issue an injunction ordering the BLM to do the following: (1) fully consult with and enter into cooperative management agreements with the State of Oregon and the Confederated Tribes for planning, administering, and managing the John Day WSRs; (2) establish detailed boundaries and prepare comprehensive management plans for the John Day WSRs; (3) prepare an EIS that evaluates a full range of alternative management plans and strategies for the John Day WSRs and that considers, analyzes, and discloses the cumulative impacts on the river components of site-specific activities such as grazing; and (4) cease livestock grazing on the BLM-administered lands within one-quarter mile back from the high water mark of the John Day WSRs where such lands are in "poor" or "fair" condition, until the BLM has prepared comprehensive management plans and an EIS for the John Day WSRs and the lands have recovered to a "good" or "excellent" condition.

■ The BLM argues that this court lacks subject matter jurisdiction to grant the requested injunctive relief[4] and that plaintiffs have failed to state a claim as to Count Two regarding establishing river boundaries. The BLM also argues that even if this court has subject matter jurisdiction, summary judgment should be denied.

### I. *Judicial Review*

■ The BLM's actions pursuant to NEPA and the WSRA are reviewed under the APA, 5 USC § 706(2)(A). *Nevada Land Action Ass'n v. United States Forest Serv.*, 8 F.3d 713, 715 (9th Cir.1993) (NEPA); *Oregon Natural Desert Ass'n v. Green*, 953 F.Supp. 1133, 1142 (D.Or.1997) (WSRA). The APA

---

3. Scoping is an "early and open process for determining the scope of issues to be addressed and for identifying the significant issues related to a proposed action." 40 CFR § 1501.7.

4. When a jurisdictional motion raises factual issues involving the merits of the claim, summary judgment standards apply. *Augustine v. United States*, 704 F.2d 1074, 1077 (9th Cir.1983).

"Therefore, the moving party should prevail only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Id.* Thus, to the extent that the BLM's motion to dismiss raises factual issues that go to the merits of plaintiffs' claims, this court will treat the motion as one for summary judgment.

allows courts to review final agency action for which there is no other adequate remedy. 5 USC § 704. Agency action includes the failure to act. 5 USC § 551(13). Under the APA, the reviewing court must conduct a "thorough, probing, in-depth review." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). However, the standard of review is "highly deferential" and "presumes an agency's action to be valid." *Ethyl Corp. v. EPA*, 541 F.2d 1, 34 (D.C.Cir.), *cert denied*, 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976).

 A reviewing court may set aside an agency's decision only if it is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 USC § 706(2)(A). An agency's decision is arbitrary and capricious if it:

> has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*O'Keeffe's Inc. v. U.S. Consumer Product Safety Commission*, 92 F.3d 940, 942 (9th Cir.1996), quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). A reviewing court must determine whether the agency has "considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 105, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983).

 Summary judgment is appropriate "[w]here agency action is challenged on the record as arbitrary, capricious, and in violation of procedures required by law." *Resources, Ltd., Inc. v. Robertson*, 789 F.Supp. 1529, 1534 (D.Mont.1991), *aff'd in part and rev'd in part*, 35 F.3d 1300 (9th Cir.1993), citing *Northern Spotted Owl v. Hodel*, 716 F.Supp. 479 (W.D.Wash.1988).

## II. THE WSRA (Counts One, Two, and Five)

### A. Detailed Boundaries (Count Two)

Plaintiffs concede that Count Two of the Amended Complaint should be dismissed because the BLM complied with the WSRA when it established preliminary boundaries which became effective in 1990. *See* 54 Fed Reg 50,825 (Dec 11, 1989). Thus, the BLM's motion to dismiss Count Two is granted and Count Two is dismissed with prejudice.

### B. Planning Process (Count One)

Plaintiffs argue that the BLM violated the WSRA by failing to prepare comprehensive management plans after consultation with the State of Oregon, and by failing to enter into cooperative management agreements with the Confederated Tribes.

#### 1. Comprehensive Management Plan

The WSRA provides that:

> For rivers designated on or after January 1, 1986, the Federal agency charged with the administration of each component of the National Wild and Scenic River System shall prepare a comprehensive management plan for such river segment to provide for the protection of the river values. The plan shall address resource protection development of lands and facilities, user capacities, and other management practices necessary or desirable to achieve the purposes of this chapter. The plan shall be coordinated with and may be incorporated into resource management planning for affected adjacent Federal lands. The plan shall be prepared, after consultation with State and local governments and the interested public within 3 full fiscal years after the date of designation. Notice of completion and availability of such plans shall be published in the Federal Register.

16 USC § 1274(d).

 The BLM concedes that it has not prepared comprehensive management plans for the John Day WSRs within the time frame mandated by the WSRA.[5] Therefore, it

---

5. The BLM never finalized the draft plan released in 1993.

is clearly in violation of 16 USC § 1274(d) and summary judgment is granted for plaintiffs on Count One and the parallel portion of Count Nine alleging that the BLM's violation of the WSRA violated the APA. Accordingly, plaintiffs are entitled to the appropriate declaration as requested in the Amended Complaint.

■■■ Plaintiffs also request an injunction compelling the BLM to prepare comprehensive management plans for the John Day WSRs. The BLM argues that this court lacks subject matter jurisdiction to enter such an injunction since the BLM is in the process of preparing a plan for both of the John Day WSRs. This argument fails because the type of relief requested does not bear on whether this court has subject matter jurisdiction. Plaintiffs allege violations of federal statutes giving rise to federal question jurisdiction. These violations may be reviewed in this court under the APA, § 706(2)(A). Therefore, the BLM's motion to dismiss for lack of subject matter jurisdiction plaintiffs' request for an injunction requiring the BLM to prepare comprehensive management plans for the John Day WSRs is denied.

■■■ However, the issue remains as to whether such an injunction is warranted. The Supreme Court has clearly stated that when a statute has been violated, an injunction does not automatically follow. *Weinberger v. Romero-Barcelo,* 456 U.S. 305, 314–15, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982). Rather, an injunction is appropriate only when necessary to prevent irreparable harm. *Id* at 312. "Injunctions are an extraordinary remedy issued at a court's discretion when there is a compelling need." *Natural Resources Defense Council, Inc. v. E.P.A.,* 966 F.2d 1292, 1300 (9th Cir.1992) (declining to issue an injunction against the EPA despite violation of a statutory deadline under the Clean Water Act). However, "environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.,* irreparable. If such injury is sufficiently likely, therefore, the balance of the harms will usually favor the issuance of an injunction to protect the environment." *Amoco Production Co. v. Village of Gambell,* 480 U.S. 531, 544, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987).

The BLM argues that a mandatory injunction is the equivalent of a writ of mandamus and, thus, should be governed by mandamus standards, citing *Fallini v. Hodel,* 783 F.2d 1343, 1344–45 (9th Cir.1986). However, plaintiffs counter that the APA provides that a court "shall compel agency action unlawfully withheld." 5 USC § 706(1). Thus, plaintiffs argue that APA standards should apply, citing the more recent case of *Independence Mining Co., Inc. v. Babbitt,* 105 F.3d 502, 507 n. 6 (9th Cir.1997).

In *Independence Mining Co.,* the Ninth Circuit did not reconcile its earlier decisions applying mandamus standards to requests for mandatory injunctions under the APA. Indeed, as the Ninth Circuit case law now stands, it is not clear which standards apply when deciding such requests. However, in this case, under either standard, plaintiffs are entitled to an injunction requiring the BLM to prepare comprehensive management plans.

### a. *APA Standards*

■■■ In assessing whether plaintiffs are entitled to relief under the APA, 5 USC § 706(1), this court is guided by the factors set forth *Telecommunications Research and Action Center v. F.C.C. ("TRAC"),* 750 F.2d 70, 79–80. These factors are as follows:

(1) the time agencies take to make decisions must be governed by a "rule of reason"; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by the delay; and (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency actions is unreasonably delayed.

*Id* at 80 (citations and quotation marks omitted).

Plaintiffs are clearly entitled to the requested relief under the *TRAC* factors. First, Congress provided that a comprehensive management plan be prepared "within 3 full fiscal years after the date" of the John Day WSRs' designation under the WSRA. 16 USC § 1274(d). Congress designated the rivers on October 28, 1988. PubL No 100–557, § 102, 102 Stat 2782 (1988). The federal fiscal year begins on October 1 of each year and ends on September 30 of the following year. 31 USC § 1102. Therefore, the BLM should have prepared the comprehensive management plans by October 28, 1992. Because no plan currently exists, the BLM is almost six years past the deadline.

Second, the consequences of the BLM's failure fall neither into the economic realm nor specifically into the realm of human health and welfare. However, the public has a significant interest in the preparation of a comprehensive management plan. The WSRA is intended to enhance designated rivers' "outstandingly remarkable" values. A comprehensive management plan will ensure the public that the BLM is properly managing the river to enhance such important values as wildlife, scenery, cultural resources, and recreational opportunities.

Third, the BLM has acknowledged that it is currently preparing a comprehensive management plan for both John Day WSRs and intends to finish by November 1, 1999, the date plaintiffs request this court set for completion of the plans. Thus, the BLM will not be adversely affected by a court order setting November 1, 1999 as the date for completion of the comprehensive management plans.

BLM concedes that it is well past the statutory deadline. However, it argues that courts are hesitant to issue an order for action which the agency is already undertaking. *See, eg, TRAC,* 750 F.2d at 80 (declining to issue an order because of FCC assurances that it was "moving expeditiously" to resolve the delayed action); *Oil, Chemical and Atomic Workers Intern. Union v. Zegeer,* 768 F.2d 1480, 1488 (D.C.Cir.1985) (concluding that the most of the *TRAC* factors weighed in plaintiffs' favor but refusing to issue an order because the delay in the agency's action was not unreasonable).

On the other hand, courts have often ordered agencies to take action within a certain time frame. *See, eg, Idaho Sportsmen's Coalition v. Browner,* 951 F.Supp. 962, 969 (W.D.Wash.1996) (compelling the EPA to promulgate a list of water-quality impaired streams in Idaho, even though the EPA was in the process of preparing the list); *Nakajima All Co., Ltd. v. United States,* 691 F.Supp 358, 364 (Ct Int'l Trade 1988) (compelling the Department of Commerce to complete and publish the results of certain ongoing administrative reviews).

There is no magical formula to determine whether or not to issue an order compelling agency action which the agency reports it is already undertaking. However, in this case, the BLM is almost six years past the statutory deadline. In addition, after releasing the draft plan in 1993, which itself was a year past the statutory deadline, the BLM did not return to the task of preparing a comprehensive management plan until after the plaintiffs filed this lawsuit. BLM's actions up to this point inspire little confidence that a comprehensive management plan will be promulgated by November 1, 1999, without a court order mandating such action.

**b. *Writ of Mandamus Standards***

█ Plaintiffs also meet the mandamus standards set forth in *Fallini.* Under *Fallini,* plaintiffs must establish: (1) their claim is "clear and certain;" (2) the duty of the government officer is "ministerial and so plainly prescribed as to be free from doubt;" and (3) no other adequate remedy is available. *Fallini,* 783 F.2d at 1345.

Here, the BLM's violation of the WSRA is clear and convincing given that the BLM is nearly six years past the statutory deadline. In addition, because the WSRA requires that the BLM prepare a comprehensive management plan, the BLM's duty is "so plainly prescribed as to be free from doubt." The contents of the plan are plainly discretionary but the preparation of the plan is not. Finally, plaintiffs have no other adequate remedy. Again, the BLM argues that plaintiffs *do* have an adequate remedy, namely that the BLM is currently preparing the comprehensive management plan. However, the BLM's "trust us" approach is not warranted given

its belated actions since the designation of the John Day WSRs in 1988.

■ Thus, under either the *TRAC* standards or the mandamus standards, plaintiffs are entitled to their requested injunction. Therefore, the BLM is ordered to prepare a comprehensive management plan for the John Day WSRs by November 1, 1999.

### 2. *Cooperative Management Agreement*

Plaintiffs argue that the BLM acted arbitrarily and capriciously by failing to enter into a cooperative management agreement with the Confederated Tribes as required by the 1988 Act. However, the BLM argues that plaintiffs may not assert this as an element of proposed injunctive relief because: (1) plaintiffs failed to request such injunctive relief in their Amended Complaint; (2) plaintiffs lack standing to represent the interests of the Confederated Tribes; and (3) Congress did not provide any guidelines for the cooperative management agreement, thus committing its content to the BLM's discretion.

Plaintiffs respond to the BLM's first argument by noting that the cooperative management agreement is related to and should be prepared in conjunction with the comprehensive management plan. Therefore, they argue that they are not asserting a new claim but instead are requesting this court to fashion an appropriate remedy for the BLM's violation of the WSRA of not timely preparing a comprehensive management plan. However, the 1988 Act provides for a comprehensive management plan in a completely separate section (16 USC § 1274(d)) than the section requiring a cooperative management agreement (PubL No 100–557, § 105(a)(2)). Although it would be most efficient and effective if the cooperative management agreement is prepared at the same time as the preparation of a comprehensive management plan, the former is not the antecedent of the latter and is designed for a different purpose. Unlike the comprehensive management plan which requires consultation with state and local governments and the interested public, the cooperative management agreement is clearly for the benefit of the affected tribes, in this case the Confederated Tribes. *See* 134 CongRec 29,443 (Oct 7, 1988) (Senator Hatfield stating section 105 "provides an as-surance for the tribes, and individual Indians, that their treaty rights will be fully respected.").

■ Plaintiffs, as non-tribes, do not have standing to assert a violation of this section of the 1988 Act. The standing requirement "embodies a basic jurisdictional idea born of Article III's 'case or controversy' requirement ... [and asks] 'whether ... the plaintiff has shown injury to himself that is likely to be redressed by a favorable decision.'" *Idaho Conservation League v. Mumma,* 956 F.2d 1508, 1513 (9th Cir.1992), citing *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 38, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976). Where a party does not rely on a specific statute authorizing judicial review, the standing analysis focuses on whether the party has a sufficient personal stake in the outcome of an otherwise justiciable controversy to ensure that the dispute sought to be adjudicated will be "presented in an adversary context and in a form historically viewed as capable of judicial resolution." *Sierra Club v. Morton,* 405 U.S. 727, 731, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). Where, however, a party relies on a statute authorizing judicial review of the actions of public officials under certain circumstances, the standing analysis first focuses on whether the statute in question authorizes review at the behest of the plaintiff. *Id.*

■ Where, as here, the plaintiff seeks judicial review under the APA, the plaintiff must show that "the injury he complains of (his aggrievement, or the adverse effect upon him) falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis of his complaint." *Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 883, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). This requirement is met if the plaintiff's interest has a "plausible relationship to the policies" underlying the statute. *Clarke v. Securities Industry Ass'n,* 479 U.S. 388, 403, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987).

Section 105(a)(2) of the 1988 Act is intended to benefit the tribes affected by the designation of a river under the WSRA. Plaintiffs' alleged injury is that the John Day WSRs are not adequately protected because the

BLM has not prepared comprehensive management plans. However, the cooperative management agreement seeks to assure that treaty rights are respected in the development of the comprehensive management plan. Because plaintiffs are not tribes and in fact may have interests adverse to the tribes, plaintiffs' injury is thus not within the "zone of interest" of section 105(a)(2).

Finally, even if plaintiffs had the requisite standing, ordering the BLM to enter into a cooperative management agreement would be inappropriate. An agreement, by definition, must be mutually acceptable to all parties. This court cannot mandate such mutual agreement. The BLM is currently negotiating an agreement with the Confederated Tribes; however, some sticking points remain. Resolving these disagreements must be left to the BLM and the Confederated Tribes. However, this court will not allow the failure of the parties to enter into a cooperative management agreement to excuse the BLM's timely completion of the comprehensive management plan by November 1, 1999.

### C. Grazing (Count Five)

Plaintiffs also allege that the BLM violated the WSRA by authorizing site-specific activities that have cumulatively degraded the "outstandingly remarkable" values of the John Day WSRs. Thus, plaintiffs argue that the BLM has violated the WSRA's requirement that it administer the designated rivers "to protect and enhance natural values." 16 USC § 1281(a). For the main stem John Day WSR, these values include fish, wildlife, scenery, recreation, geology, cultural resources, and paleontology. For the South Fork John Day WSR, these values include botany, fish, wildlife, scenery, recreation, and paleontology. Plaintiffs ask this court to require the BLM to identify lands within the John Day WSRs that are in "poor" or "fair" condition and then rest those lands from grazing until their conditions improve.

The BLM again argues that this court does not have jurisdiction over Count Five because plaintiffs have not properly sought judicial review of site-specific BLM decisions authorizing livestock grazing. Instead, plaintiffs mount a generalized challenge to the management of the John Day WSRs. The BLM argues that this type of challenge is not authorized by the APA.

This court agrees that under controlling case law plaintiffs cannot mount a wholesale challenge to BLM's management of the John Day WSRs. See Lujan, 497 U.S. at 890–9; see also ONRC Action v. Bureau of Land Management, 150 F.3d 1132, 1136–37, 1998 WL 423413 at *3–4 (9th Cir. July 29, 1998) (discussing the need for site-specific action). In Lujan, the Supreme Court held that the plaintiffs could not challenge the BLM's land withdrawal review program because the program "does not refer to a single BLM order or regulation, or even to a completed universe of particular BLM orders and regulations." Id. Thus, plaintiffs were not challenging a final agency action as required by the APA. Instead, the Court held that the plaintiffs had to wait and bring challenges to individual decisions by the BLM, not the entire program. Similarly, plaintiffs cannot challenge the BLM's overall grazing policy in the John Day WSRs, but instead should have challenged individual grazing permits. Thus, summary judgment is granted against plaintiffs on Count Five.

However, plaintiffs further argue that the grazing injunction is no more than an additional remedy for the BLM's failure to prepare a comprehensive management plan for the John Day WSRs. According to plaintiffs, if the BLM had timely prepared a comprehensive management plan, then the BLM would have been less likely to violate the WSRA when making site-specific decisions. Thus, according to plaintiffs, this court need not decide whether the grazing permits actually violated the WSRA, but only need determine whether prohibiting grazing would be an appropriate remedy for the BLM's established WSRA violation. Plaintiffs note that the BLM stipulated to this type of action as a form of judgment after Judge Haggerty granted plaintiffs' motion for summary judgment in Green, supra.

In Green, the BLM had prepared a comprehensive management plan which allowed grazing to continue on land along the Donner and Blitzen Rivers. In preparation of the plan, the BLM hired five scientists from the Nature Conservancy to conduct a survey and

prepare a report regarding sensitive native plants and unique natural areas in the river area. The scientists unanimously recommended that BLM stop grazing the entire river corridor and prevent any cattle from trespassing.

In contrast, this case involves no similar recommendation. In addition, although the BLM's past grazing practices clearly contributed to the degradation of the John Days WSRs, many of the facts relied on by plaintiffs fail to link the BLM's *current* grazing practices to the health of the John Day WSRs. For example, plaintiffs point to the fact that parts of the John Day WSRs are water quality limited for the parameter of temperature during the summer and then suggest that the BLM authorizes cattle to graze in riparian areas during the summer. However, the BLM only manages a relatively small amount of public land within the John Day WSRs interim river areas, making it likely that management practices on private land may have more affect on the overall health of the rivers. Further, the BLM no longer authorizes summer grazing in the majority of riparian pastures it controls along the John Day WSRs. Government's Exhibit 4, Declaration of Dan Tippy, ¶ 12.

Plaintiffs also look to the listing of the steelhead in the Columbia River Basin as an indicator of the health of the John Day WSRs. However, that listing encompassed steelhead populations from the entire Columbia River Basin. Without a specific link between the BLM's current grazing practices in the John Day WSRs and the National Marine Fisheries Service's decision, the steelhead listing provides little support for plaintiffs' request to prevent grazing.

Plaintiffs' reliance on the BLM's evaluations of six allotments also is not persuasive. The BLM has introduced evidence which establishes that riparian areas may be able to recover despite limited grazing. *See* Government's Exhibit 17, photographs attached to the Declaration of Craig Obermiller. Thus, even if certain allotments are degraded, plaintiffs have not established that a complete prohibition on grazing is necessary for them to recover.

Finally, if the BLM bans all grazing on public land, then ranchers may simply move their cattle onto private land over which the BLM cannot implement grazing regulations. Because private land makes up the majority of the John Day WSRs, the shifting of grazing onto unregulated private land could well cause the overall health of the John Day WSRs to suffer as an unintended and unfortunate effect of plaintiffs' requested injunction.

Although it is clear that in the past the BLM has permitted grazing on public allotments to cause degradation of the riparian areas [as acknowledged in the 1993 draft EIS], the BLM appears to have changed course and now has adopted more ecological grazing practices. Since an injunction speaks only to future actions, it is the BLM's current practices extrapolated into the future, rather than its abandoned past practices, that influence this court's determination. Improvement will take time, but this court is persuaded that the BLM is moving in the right direction by limiting grazing and negotiating with private landowners.

■ In summary, plaintiffs have not established that prohibiting grazing on certain allotments is the best solution for the problems plaguing the John Day WSRs. Thus, this court declines to order the BLM to ban all grazing on allotments categorized as "poor" or "fair" as a remedy for the BLM's failure to prepare a comprehensive management plan. However, if circumstances change for the worse, plaintiffs are not foreclosed from renewing their request for appropriate injunctive relief as a supplemental remedy.

### III. *NEPA (Counts Six and Seven)*

Plaintiffs argue that the BLM violated NEPA by failing to write an EIS for the John Day WSRs. However, the BLM counters that this court has no jurisdiction to review plaintiffs' claim because: (1) plaintiffs are not challenging any final agency action; (2) the BLM is currently preparing an EIS in relation to the John Day WSRs comprehensive management plan; and (3) an EIS is not required for the grazing decisions.

## A. *Statutory Framework*

NEPA requires that an agency must prepare an EIS for all "proposals for legislation and other major federal actions significantly affecting the quality of the human environment." 42 USC § 4332(2)(C). The Council for Environmental Quality ("CEQ") has promulgated regulations implementing the requirements and objectives of NEPA and providing agencies with specific guidelines for complying withe NEPA. *See* 40 CFR §§ 1500–1508.

▮▮▮▮ An agency must prepare an EIS if "substantial questions are raised as to whether a project … may cause significant degradation of some human environmental factor." *LaFlamme v. Federal Energy Regulatory Comm'n,* 852 F.2d 389, 397 (9th Cir. 1988) (internal quotations omitted). "The plaintiff need not show that significant effect will in fact occur, but if the plaintiff raises substantial questions whether a project may have a significant effect, an EIS must be prepared." *Id.* A federal action may have significant impacts if it is "related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts." 40 CFR § 1508.27(7).

## B. *Analysis*

▮▮▮ First, as the BLM concedes, it clearly has a duty to prepare an EIS in relation to the development of comprehensive management plans for the John Day WSRs. Because the EIS should have been prepared in conjunction with the comprehensive management plans, the BLM "unlawfully withheld" the EIS to the same extent it "unlawfully withheld" the comprehensive management plans. Thus, plaintiffs are entitled to summary judgment on Count Six to the extent that it alleges that the BLM violated NEPA by failing to prepare an EIS. However, this court will not dictate to the BLM the contents of that EIS. *See Bennett Hills Grazing Ass'n. v. United States,* 600 F.2d 1308, 1309 (9th Cir.1979) (district courts should not "interfere with an agency's proceedings before the agency renders its decision"); *see also*

*Kleppe v. Sierra Club,* 427 U.S. 390, 406 n. 15, 96 S.Ct. 2718, 49 L.Ed.2d 576 ("But the time at which a court enters the process is when the report or recommendation on the proposal is made, and someone protests either the absence or the adequacy of the final impact statement."). If plaintiffs believe that the EIS prepared by the BLM is inadequate, then they may challenge the EIS at that time.

Second, the more difficult issue is whether the BLM was required to prepare a new EIS for site-specific actions, such as approving grazing on allotments within the John Day WSRs, or whether the BLM may "tier" to the 1984 and 1985 EISs created in relation to the resource management plans. Tiering is defined in the CEQ regulations as:

> the coverage of general matters in broader [EISs] (such as national program or policy statements) with subsequent narrower statements or environmental analyses (such as regional or basinwide program statements or ultimately site-specific statements) incorporating by reference the general discussions and concentrating solely on the issues specific to the statement subsequently prepared.

40 CFR § 1508.28.

Plaintiffs argue that the EISs prepared by BLM in 1984 and 1985 include out-of-date factual information, do not analyze the cumulative impacts of BLM's grazing decisions in conjunction with private landholders' grazing decisions, and do not take into account the requirements imposed on BLM by the WSRA. Thus, according to plaintiffs, the BLM could not properly tier its grazing decisions to those EISs.

Defendants, however, again cite *Lujan,* arguing that this court does not have jurisdiction to hear plaintiffs' claim because they are challenging the BLM's entire grazing management policy for the John Day WSRs instead of individual decisions.

Plaintiffs dispute the applicability of *Lujan.* They argue that they are not grouping BLM's grazing permits into a single program and alleging that BLM must prepare an EIS for that program. Instead, the grazing permits are concrete, final actions by the BLM, which have had cumulative impacts on the

environment. Because these cumulative impacts are not adequately addressed in the 1984 or 1985 EISs, plaintiffs argue that the BLM's individual grazing decisions cannot be tiered to those EISs and it should have prepared a separate EIS.

 Despite the characterization of their claim, in reality plaintiffs are challenging the BLM's grazing policy for the John Day WSRs. This "policy" includes a multitude of site-specific decisions, past and future. This court concludes that *Lujan* forecloses this type of wholesale challenge. If the BLM inappropriately tiered its site-specific decisions to the 1984 and 1985 EISs, which is very likely, then plaintiffs must challenge the decisions individually. Thus, summary judgment is granted for defendants on Count Seven.

## IV. *Plaintiffs' Motion for an Order Requiring Defendants to Submit the Administrative Record*

On June 17, 1998, plaintiffs filed a motion for an order requiring defendants to submit the administrative record, (docket # 50). Based on the above rulings on the parties' summary judgment motion, that motion is denied as moot.

## CONCLUSION

The BLM has violated the WSRA by failing to prepare a comprehensive management plan by the statutory deadline. Although the BLM may have been diligently working on other projects, it is currently six years over the deadline. Thus, plaintiffs are entitled to summary judgment on Count One and that portion of Count Nine alleging that the BLM violated the WSRA. In addition, plaintiffs are entitled to summary judgment on that portion of Count Six and Nine alleging a NEPA violation for failure to prepare an EIS. The BLM has advised this court that it can finish preparing comprehensive management plans by November 1, 1999, without causing undue hardship on other projects. Thus, the BLM is ordered to prepare a comprehensive management plan and an EIS for the John Day WSRs by November 1, 1999.

Defendants are entitled to summary judgment against Counts Five and Seven.

Count Two is dismissed as moot, and plaintiffs voluntarily dismissed Counts Three, Four, and Eight.

This appears to resolve all of the issues in the Amended Complaint.

## APPENDIX

### LIST OF ABBREVIATIONS

| | |
|---|---|
| APA: | Administrative Procedure Act |
| BLM: | Bureau of Land Management |
| CEQ: | Council for Environmental Quality |
| EIS: | Environmental Impact Statement |
| EPA: | Environmental Protection Agency |
| ESA: | Endangered Species Act |
| ESU: | Evolutionarily Significant Unit |
| John Day WSRs: | The Areas of the John Day River and South Fork of the John Day River designated as recreational rivers under the WSRA |
| NEPA: | National Environmental Policy Act of 1972 |
| WSRA: | Wild and Scenic Act of 1968 |