CENTER FOR BIOLOGICAL DIVERSITY, et al., Plaintiffs,

v.

Robert LUECKEL, Ottawa National Forest Supervisor, et al., Defendants.

No. 2:01–CV–194.

United States District Court, W.D. Michigan, Northern Division.

Dec. 6, 2002.

---

Terrence Dean, U.S. Attorney's Office, Marquette, MI, for Ann M. Veneman, Dale Bosworth, Robert Lueckel and Thomas A. Schmidt.

Robert I. Dodge, United States Attorney's Office, Grand Rapids, MI, for Ann M. Veneman.

Brent R. Plater, Center for Biological Diversity, Oakland, CA, for Center for Biological Diversity, Northwoods Wilderness Recovery and Superior Wilderness Action Network.

### *OPINION*

QUIST, District Judge.

Plaintiffs, Center for Biological Diversity, Northwoods Wilderness Recovery, and Superior Wilderness Action Network, have sued Defendants, Robert Lueckel, Ottawa National Forest Supervisor, Thomas A. Schmidt, Hiawatha National Forest Supervisor, and Ann M. Venneman, United States Secretary of Agriculture, pursuant to the Administrative Procedures Act

("APA"), 5 U.S.C. §§ 701 to 706. Plaintiffs allege that the United States Forest Service ("Forest Service") failed to comply with: (1) the Wild and Scenic Rivers Act ("WSRA"), 16 U.S.C. §§ 1271 to 1287, by preparing Comprehensive Management Plans ("CMPs") or establishing detailed boundaries for congressionally Designated Wild and Scenic Rivers ("DWSR") in Ottawa National Forest ("ONF") and Hiawatha National Forest ("HNF"); (2) the National Forest Management Act ("NFMA"), 16 U.S.C. § 1600 to 1614, by amending or revising its forest plans, after providing public notice, to adopt and/or implement CMPs for DWSRs within ONF and HNF; and (3) the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 to 4361, by preparing Environmental Impact Statements ("EIS"), Environmental Assessments ("EA"), or Categorical Exclusions ("CE") for both creating CMPs and establishing detailed river corridor boundaries. Plaintiffs seek a declaration that Defendants did not comply with the WSRA and an injunction ordering Defendants to comply with the WSRA and halt all timber harvesting and road construction until they have fully complied. Now before the Court are the parties' cross-motions for summary judgment. Defendants have moved for summary judgment on all claims, while Plaintiffs have moved for summary judgment only on their WSRA claims. For the reasons stated below, the Court will dismiss the case for lack of standing.

## I. Statutory and Procedural Overview

ONF consists of almost one million acres of federally-owned land located in the western portion of Michigan's Upper Peninsula. HNF consists of approximately 880,000 acres of federally-owned land located in the central and eastern portion of Michigan's Upper Peninsula. Both are managed by the Forest Service. Plaintiffs allege that the Forest Service's management of ONF and HNF violates: (1) the WSRA; (2) the NFMA; and (3) the NEPA.

### A. The Wild and Scenic Rivers Act

Congress has the authority to designate Wild and Scenic Rivers under the WSRA. 16 U.S.C. §§ 1271 to 1287. The WSRA classifies rivers into three categories: "wild;" "scenic;" and "recreational." 16 U.S.C. § 1273(b).[1] "Wild" river areas "represent vestiges of primitive America" and are "free of impoundments and generally inaccessible except by trail, with watersheds or shorelines essentially primitive and waters unpolluted." 16 U.S.C. § 1273(b)(1). "Scenic" river areas are "free of impoundments, with shorelines or watersheds still largely primitive and shorelines largely undeveloped, but accessible in places by roads." 16 U.S.C. § 1273(b)(2). Finally, "recreational" river areas are those "that are readily accessible by road or railroad, that may have some development along their shorelines, and that have undergone some impoundment or diversion in the past." 16 U.S.C. § 1273(b)(3).

Once Congress designates a river, the WSRA mandates that the Forest Service manage the DWSR "in such manner as to protect and enhance the values which caused it to be included in said system without, insofar as is consistent therewith, limiting other uses that do not substantially interfere with public use and enjoyment

---

1. The classification does not determine river management; it simply describes the degree of naturalness found at a particular river at the time of designation. 47 Fed.Reg. 39,454, 39,458. With the exception of mining, 16 U.S.C. § 1280(a)(i)-(iii), the WSRA's mandate to "protect and enhance" a river's Outstandingly Remarkable Values defines the Forest Service's management regime, 16 U.S.C. § 1281(a).

of these values." 16 U.S.C. § 1281(a). Thus, while the WSRA does not ban activities such as timber harvesting and road construction, the WSRA does require that the Forest Service conduct them in such a manner as to protect and enhance river values based on designation level. The Forest Service is given the discretion to strike this balance. *Id.*

The WSRA also imposes two procedural obligations on the Forest Service after a river segment is designated. First, the Forest Service must "establish detailed boundaries" for each DWSR within one year of the date of designation. 16 U.S.C. § 1274(b). Until publication of the detailed boundaries, the WSRA establishes one-quarter mile boundaries measured from the ordinary high water mark on either side of the river.[2] *Id.* Second, the Forest Service must prepare a "comprehensive management plan" for each designated river segment that will "provide for the protection of river values" within three fiscal years of the date of designation. 16 U.S.C. § 1274(d)(1).

1. *Defendants' Compliance with the WSRA*

Located within ONF and HNF are numerous river segments that Congress named DWSRs on March 3, 1992. Michigan Scenic Rivers Act of 1991, Pub.L. No. 102–249 § 3, 106 Stat. 45 (codified at 16 U.S.C. § 1274(a)). Plaintiffs allege, and Defendants do not contest, that the Forest Service has not complied with WSRA requirements to prepare CMPs or establish detailed boundaries for the following DWSRs in ONF: the Black River, *id.* at § 1274(a)(120); the East Branch of the Ontonagon River, *id.* at § 1274(a)(124)(A);

the Middle Branch of the Ontonagon River, *id.* at § 1274(a)(124)(B); the Cisco Branch of the Ontonagon River, *id.* at § 1274(a)(124)(C); the West Branch of the Ontonagon River, *id.* at § 1274(a)(124)(D); the Main Stem of the Paint River, *id.* at § 1274(a)(125)(A); the North Branch of the Paint River, *id.* at § 1274(a)(125)(B); the South Branch of the Paint River, *id.* at § 1274(a)(125)(C); the Main Stem of the Presque Isle River, *id.* at § 1274(a)(127)(A); the East Branch of the Presque Isle River, *id.* at § 1274(a)(127)(B); the Yellow Dog River, *id.* at § 1274(a)(132); and the Sturgeon River (ONF),[3] *id.* at § 1274(a)(129)(A)-(B) (collectively "the ONF Rivers"). Plaintiffs also allege, and Defendants do not contest, that the Forest Service has not complied with WSRA requirements to prepare CMPs or establish detailed boundaries for the following DWSRs in HNF: the Carp River, *id.* at § 1274(a)(121)(A)-(F); the Sturgeon River (HNF), *id.* at § 1274(a)(128)(A)-(B); the East Branch of the Tahquamenon River, *id.* at § 1274(a)(130)(A)-(B); and the Whitefish River, *id.* at § 1274(a)(131)(A)-(C), (collectively "the HNF Rivers").

2. *The Forest Service's Management of the DWSRs in ONF and HNF*

Defendants are currently relying on separate comprehensive management plans for ONF and HNF, and they have maintained the initial one-quarter mile boundaries on either side of the DWSRs. Both plans divide the respective forests into distinct Management Areas, each of which has its own environmental characteristics and management prescription. River seg-

---

**2.** There are 640 acres in one square mile. River corridor boundaries are limited under the WSRA to an average of 320 acres per linear mile. 16 U.S.C. § 1274(b). This equates to an average boundary width of one-quarter mile from each side of the river.

**3.** There are two distinct rivers named "Sturgeon River" at issue in this action. One is located in ONF and one is located in HNF. Both are DWSRs.

ments that have been named DWSRs in ONF are within ONF"s Management Area 8.1, while the DWSRs in HNF are within HNF"s Management Area 8.4. The Management Prescriptions for these Management Areas specify the level of timber cutting and road construction permissible based on whether the DWSR has been classified as wild, scenic, or recreational.

Defendants admit that these comprehensive management plans do not comply with the CMP requirement of the WSRA, and that they have not finalized CMPs for the DWSRs at issue. However, Defendants assert that if the they had finalized CMPs, they would have, in all likelihood, adopted the development restrictions already in place under the existing Management Prescriptions. Defendants also note that while they have not established detailed boundaries for the DWSRs, the detailed boundaries could not be more expansive than the one-quarter mile boundaries they are currently implementing.

4. The Forest Service's specific current and future projects in ONF are:

(1) *Ontonagon River, East Branch, Spring Lake segment* (20.5 miles "recreational"): As part of the Deadstream–McLellan vegetative management project, the Forest Service has proposed to undertake a total of 178 acres of timber harvest. This includes twenty-seven acres of salvage-sanitation harvest, twenty acres of salvage-sanitation harvest and commercial thinning, thirty-two acres of stand clearcutting, thirty acres of individual tree selection, and sixty-nine acres of improved harvest. The Forest Service has made no final decision with respect to the Deadstream McLellan project. As part of the DeButante Pine management project, the Forest Service will reconstruct 0.15 miles of roadway.
(2) *Presque Isle River, East Branch* (fourteen miles "recreational"): As part of the Gaylord Lake management project, the Forest Service has proposed a total of 112 acres of timber cutting, including sixty-five acres of commercial thinning, thirty-two

### 3. Timber Harvest and Road Construction Within ONF and HNF

The Forest Service has harvested timber and constructed some roads, or plans to do so in the future, within ONF pursuant to its Management Prescription 8.1. In seventeen of the twenty-three DWSR segments identified in Plaintiff's complaint, the Forest Service states that there is no timber cutting or road construction now underway or proposed for the future. Of the six impacted DWSR segments, the Forest Service indicates that selected timber cutting will take place on approximately 1.2% of the total land that the DWSRs occupy, or 403 of the 31,200 acres.[4] The *total amount of road construction will be just over one mile.* Five of the impacted DWSRs are designated "recreational," and one is designated "scenic."

The Forest Service has no timber harvesting or road construction underway or planned for any of the fifteen DWSRs at issue in HNF.

acres of overstory removal, and fifteen acres of improvement harvest. The Forest Service has also proposed 0.7 miles of road reconstruction for access purposes.
(3) *Ontonagon River, Cisco Branch, Cisco Lake Segment* (ten miles "recreational"): As part of the Grosbeck management project, the Forest Service has planned eighteen acres of shelterwood seed cut and 0.2 miles of road construction.
(4) *Ontonagon River, Cisco Branch, Forest Development Road Segment* (twenty-seven miles "scenic"): As part of the Grosbeck management project the Forest Service has planned forty-five acres of shelterwood seed cut.
(5) *Paint River, Main Stem* (six miles "recreational"): As part of the Porter management project, the Forest Service has approved forty-four acres of selection harvest in northern hardwoods.
(6) *Ontonagon River, Middle Branch* (twenty miles "recreational"): As part of the Snowflake management project, the Forest Service has planned six acres of selection harvest.

### 4. *Plaintiffs' Affidavits*

In support of their claims, Plaintiffs offer affidavits from nine of their members. The first member, Raymond Weglarz, lives in Allouez, Michigan. (Weglarz Decl. ¶ 2, Pls.' Mem. Opp'n Defs.' Mot. Partial Summ. J. Ex. F.) Weglarz states that he has used DWSRs in ONF and HNF for a variety of activities, including hiking, camping, fishing, and canoeing for the past twenty-six years, and he will continue to do so in the future. (*Id.* ¶¶ 5, 6.) Weglarz states that he is "extremely concerned about the health of the environment and the maintenance of wild and scenic places in the Upper Peninsula of Michigan," (*id.* ¶ 3), and that he has "seen first hand how the continuing absence of a Comprehensive Management Plan and the failure to establish detailed river corridor boundaries for the Wild and Scenic Rivers in this lawsuit has led to the inappropriate use of a multiple-use philosophy in these areas," (*id.* ¶ 7). Specifically, Weglarz states that he observed "logging along the East Branch of the Ontonagon in the Ottawa Forest south and east of Kenton," and that the "log skid yard was placed almost on the banks of the river." (*Id.* ¶ 8.) Weglarz, however, does not provide the date of his observations or an approximation of the distance the skid yard was from the DWSR. Nor does Weglarz give the rationale behind his conclusion that the "sand erosion in and around the site will likely be a hot spot of sediment in the upper East Branch for years," (*id.*), or his assertion that the establishment of a CMP and detailed river boundaries will rectify the alleged problem, (*id.* ¶ 9).

Douglas R. Cornett, the second member, states that he resides in Marquette, Michigan. (Cornett Decl. ¶ 2, Pls.' Mem. Opp'n Defs.' Mot. Partial Summ. J. Ex. G.) Cornett states that he has used and plans to continue to use numerous DWSRs within ONF and HNF for "hiking, bird watching, hunting, fishing, plant identification, enjoyment of the forest and its scenic beauty, and study of cultural and historic sites." (*Id.* ¶ 6.) In particular, Cornett states that "[a]s a biologist, the destruction of habitat for rare and endangered species is a direct threat to my livelihood, which relies on the presence of old-growth forests, pristine Wild and Scenic river corridors, and other unaltered habitats for the benefit of threatened and endangered species studies." (*Id.* ¶ 8.) Cornett, however, does not state in detail to which old-growth forests, DWSRs, or species he refers. The only specific examples of environmental impact Cornett notes are two undated timber sales in ONF. (*Id.* ¶ 9.) Cornett contends, without explanation, that the ONF timber sales "may have had cutting units dropped or been significantly modified if Wild and Scenic River management plans had been in place." (*Id.*) Finally, Cornett states that he is "also concerned with the proper administration of statutes and regulations designed to protect public lands and the public interest." (*Id.* ¶ 8.)

The third affidavit is from member Scott Berry, who lives in Houghton, Michigan. (Berry Decl. ¶ 2, Pls.' Mem. Opp'n Defs.' Mot. Partial Summ. J. Ex. H.) Berry states that he has worked as a kayak instructor and carpenter for a company that operates in ONF. (*Id.* ¶ 3.) Berry recites his numerous positive experiences with DWSRs within ONF since he was a child, (*id.* ¶¶ 5–12), and he states that "[b]y failing to design and implement a comprehensive management plan the Forest Service is not being a good steward," (*id.* ¶ 13). Like the other affidavits discussed above, Berry's affidavit does not contain any specific statements regarding how his enjoyment of ONF and HNF has been or will be hampered due to Forest Service's failure to create a CMP or detailed river boundaries. Berry also concludes his affidavit with a statement that he is concerned

that "government agencies fully enforce and obey [ ] laws and regulations." (*Id.* at ¶ 15.)

The fourth affidavit is from member John Jungwirth of Champion Township, Michigan. (Jungwirth Decl. ¶ 2, Pls.' Mem. Opp'n Defs.' Mot. Partial Summ. J. Ex. I.) Jungwirth states that he derives "great aesthetic and spiritual benefit" from the DWSRs within ONF that are located within a few miles of his home, and that he uses those areas "regularly throughout the seasons." (*Id.* ¶¶ 3–5.) He states: "I am personally concerned about the plight of the Wild and Scenic Rivers in the Upper Peninsula because I have witnesses a systematic program of timber cutting and road building within Wild and Scenic River Corridors in violation of the law." (*Id.* ¶ 9.) While Jungwirth contends that the Forest Service's implementation of a CMP and detailed river boundaries would rectify this perceived problem, he does not state where or when these alleged illegal actions have occurred. Jungwirth also does not explain what law the timber cutting and road construction he has observed violated, or precisely what harm he has personally suffered. (*Id.* ¶ 10.) Like the other affiants, Jungwirth offers a general statement that he is concerned with the "proper administration of statutes and regulations designed to protect public lands and the public interest." (*Id.*)

The fifth affidavit is from member Steven Craig Garske of Marenisco, Michigan. (Garske Decl. ¶ 2, Pls.' Mem. Opp'n Defs.' Mot. Partial Summ. J. Ex. J.) Garske states that he is "an avid naturalist and botanist" who has used ONF extensively since he and his wife moved to Michigan's Upper Peninsula. (*Id.* ¶¶ 3–12.) He states that he intends to keep visiting ONF in the future. (*Id.* ¶ 14.) However, Garske does not specify what areas of ONF he will continue to use, nor does he state how he has been specifically harmed by the Forest Service's failure to implement a CMP and detailed river boundaries. Garske's affidavit simply amounts to a recitation of his general conservation philosophy, which is distinct from specific allegations of injury in fact.

The sixth affidavit is from member Kraig Klungness of Stanton Township, Michigan. (Klungness Decl. ¶ 2, Pls.' Mem. Opp'n Defs.' Mot. Partial Summ. J. Ex. K.) Klungness states that he regularly recreates in ONF, "including areas that are the subject of this lawsuit." (*Id.* ¶ 5.) Like Jungwirth, Klungness states that he is concerned about "the destruction of any part of the Wild and Scenic River system though a systematic program of timber cutting and road building." (*Id.* ¶¶ 8, 9.) Klungness, however, also fails to specify where and when the timber cutting of which he complains will occur, how it will specifically harm his "aesthetic and recreational use of" ONF, and how it will be rectified by the implementation of a CMP and detailed river boundaries.

The seventh affidavit is from member Daniel Patterson of Tucson, Arizona. (Patterson Decl. ¶ 2, Pls.' Mem. Opp'n Defs.' Mot. Partial Summ. J. Ex. L.) Patterson states that while he does not reside in Michigan, he has visited DWSRs in Michigan and plans to do so again in the future. (*Id.* ¶¶ 5–8.) He states: "It is clear to me that these rivers are being negatively affected by the failure of the Forest Service to create Comprehensive Management Plans and to establish river corridor boundaries." (*Id.* ¶ 9.) Patterson does not, however, state how or why he reaches this conclusion, or the way in which he has been personally injured by the Forest Service's inaction with any specificity.

The eighth affidavit is from member Rob Cadmus of Marquette, Michigan. (Cadmus Decl. ¶ 2, Pls.' Mem. Opp'n Defs.'

Mot. Partial Summ. J. Ex. M.) Cadmus states that he is "an avid whitewater and sea kayaker," and that he uses many of the DWSRs in ONF and HNF. (*Id.* ¶¶ 3–5.) He further states: "I feel that the extensive timber harvests in the National Forests of Michigan place Wild and Scenic Rivers of the area at great risk. I believe that in order to protect these rivers logging and road building must not be allowed anywhere near the Wild and Scenic Rivers of Michigan or their tributaries." (*Id.* ¶ 6.) However, Cadmus does not state where this alleged logging and road building is taking place, nor does he explain with any specificity how he would be personally injured.

The ninth affidavit is from member Jeff Ensign of Whitefish Township, Michigan. (Ensign Decl. ¶ 2, Pls.' Mem. Opp'n Defs.' Mot. Partial Summ. J. Ex. N.) Ensign states that he has used the DWSRs in ONF and HNF in the past and will continue to do so in the future. (*Id.* ¶¶ 4–9.) He states that he "is personally concerned about the plight of the Hiawatha and Ottawa National Forests and destruction of any part of the Wild and Scenic River system through a systematic program of timber cutting and road building." (*Id.* ¶ 10.) Similar to the above affiants, Ensign fails to state where the offending activity is occurring, or will occur, nor does he specifically explain how the Forest Service's failure to implement CMPs and detailed river boundaries will actually harm him.

## B. *The National Forest Management Act*

The NFMA requires the Forest Service to devise an integrated Land Resource Management Plan ("LRMP") for each National Forest. 16 U.S.C. § 1604(f)(1). It also requires "public participation in the development, review, and revision of land management plans." 16 U.S.C. § 1604(d). If the Forest Service seeks to significantly amend an LRMP after final adoption, pub-

lic involvement is required. 16 U.S.C. § 1604(f)(4).

Plaintiffs claim that the Forest Service failed to amend or revise the ONF and HNF Forest Plans to adopt and/or implement CMPs for their respective DWSRs. Plaintiffs contend that this alleged failure constituted "agency action unlawfully withheld or unreasonably delayed within the meaning of the APA." (Am. Comp. ¶ 59 (citing 5 U.S.C. § 706(1)).)

## C. *The National Environmental Policy Act*

The NEPA requires the Forest Service to prepare an EIS for any proposed major federal action that may significantly affect the quality of the environment. 42 U.S.C. § 4332(2)(C). The EIS must include an analysis of any adverse environmental impact that cannot be avoided should the project be implemented, alternatives to the proposed action, and any irreversible and irretrievable commitment of resources which would be involved if implemented. *Id.* To determine whether a proposed action may significantly affect the quality of the environment and require an EIS, the agency may first prepare an EA. 40 C.F.R. §§ 1501.3, 1501.4. In certain limited circumstances, the agency may prepare a CE, thereby excluding the proposed project from the NEPA's EIS and EA requirements. *Id.*

Plaintiffs claim that "[c]reating Comprehensive Management Plans and establishing detailed river corridor boundaries constitute major federal actions that will significantly affect the quality of the human environment." (Am.Comp.¶ 63.) Plaintiffs also assert that Defendants have failed to prepare an EIS, EA, or a CE for both the CMP and establishing detailed river corridor boundaries. (*Id.*) Thus, Plaintiffs contend that this alleged "failure to comply with NEPA constitutes agency

action unlawfully withheld or unreasonably delayed within the meaning of the APA." (*Id.* ¶ 19 (citing 5 U.S.C. § 706(1)).)

## II. Standard of Review

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R.Civ.P. 56. Material facts are facts which are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *Id.*

The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir.1992) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

## IV. Discussion

The Court has before it three motions for summary judgment: (1) Plaintiffs' Motion for Partial Summary Judgment on WSRA Claims; (2) Defendants' Motion for Partial Summary Judgment on Claims Relating to the Ottawa National Forest for Lack of Standing; and (3) Defendants' Motion for Partial Summary Judgment on Claims Relating to the Hiawatha National Forest for Lack of Standing. Each will be considered in turn.

### A. Plaintiffs' Motion for Partial Summary Judgment on WSRA Claims

Plaintiffs contend that "[t]his case simply challenges the Defendants' failure to establish detailed river corridor boundaries and create CRMPs for each Wild and Scenic River in the Ottawa [and Hiawatha] National Forest[s]." (Pls.' Mem. Opp'n Defs.' Mot. Partial Summ. J. at 10.) Defendants do not contest that the Forest Service has not complied with these two procedural aspects of the WSRA. As relief, Plaintiffs seek an injunction from this Court ordering the Forest Service to comply. In support of their claims, Plaintiffs have offered affidavits from their members attesting to "environmental degradation inconsistent with the WSRA [that] has occurred in the Designated Wild and Scenic Rivers" as a result of timber harvest and road construction. (Pls.' Mem. Supp. Partial Summ. J. at 17–18.) Plaintiffs contend that the environmental damage that their members have perceived would not have occurred if the Forest Service had complied with the WSRA. (*Id.* at 18.)

Plaintiffs' suit is grounded on section 706 of the APA. 5 U.S.C. § 706(1). While section 706 authorizes courts to compel agency action "unreasonably delayed," it merely states a court's general scope of judicial review of an agency's lack of action. *Newton County Wildlife Ass'n v. United States Forest Serv.*, 113 F.3d 110, 114 (8th Cir.1997). Section 706 does not have a bearing on whether a plaintiff has met the prerequisites for injunctive relief.[5] Thus, to succeed, Plaintiffs must establish a basis for injunctive relief other than relying solely on the APA.

Plaintiffs essentially ask the Court to grant an injunction against the Forest

---

**5.** The Court notes that the United States District Court for the District of Oregon held that the APA authorizes courts to issue injunctive relief for failure to prepare river plans. *Nat'l Wildlife Fed'n v. Cosgriffe*, 21 F.Supp.2d 1211, 1218–19 (D.Or.1998). However, since this decision appears to be an anomaly in the long line of environmental injunction cases, the Court finds *Cosgriffe* non-controlling and non-persuasive.

Service because the Forest Service has failed to comply with two procedural requirements of the WSRA. Specifically, Plaintiffs allege that the Forest Service has not prepared CMPs and established detailed boundaries for DWSR within ONF and HNF. Injunctive relief is an extraordinary remedy, which does not automatically follow a violation of a procedural environmental statute. *Weinberger v. Romero Barcelo,* 456 U.S. 305, 311–15, 102 S.Ct. 1798, 1802–05, 72 L.Ed.2d 91 (1982) (upholding district court's refusal to grant an injunction for Navy's discharge of ordnance into waters near Puerto Rico in violation of Federal Water Pollution Control Act because the discharge had not polluted the waters). The Forest Service's failure to adopt a CMP does not, "on its own, grant the Court authority to enjoin" the Forest Service, nor does the WSRA alone provide a basis for relief. *Sierra Club v. United States,* 23 F.Supp.2d 1132, 1137 (N.D.Cal.1998). For example, federal courts, relying on the Supreme Court's decision in *Brock v. Pierce County,* 476 U.S. 253, 106 S.Ct. 1834, 90 L.Ed.2d 248 (1986), have refused to enjoin timber sales when agencies have not completed CMPs in a timely manner under the WSRA. *See, e.g., Sierra Club v. Babbitt,* 69 F.Supp.2d 1202, 1251–52 (E.D.Cal.1999) ("The reluctance of courts to apply injunctive relief in cases where the sole infraction is the failure of the agency to conform to planning requirements appears to reflect courts' judgment that the loss of agency ability to act is too severe a penalty to apply when the only violation is procedural"); *see also Newton County Wildlife Ass'n,* 113 F.3d at 112–13; *Sierra Club,* 23 F.Supp.2d at 1137. Thus, Plaintiffs must not only show that the Forest Service has violated the WSRA, but also the likelihood of irreparable harm to their members as a result of the violations. *Weinberger,* 456 U.S. at 311–12, 102 S.Ct. at 1803 ("An injunction should issue

only where the intervention of a court of equity 'is essential in order effectually to protect property rights against injuries otherwise irremediable.' ") (quoting *Cavanaugh v. Looney,* 248 U.S. 453, 456, 39 S.Ct. 142, 143, 63 L.Ed. 354 (1919)).

To justify injunctive relief, there must be a "substantial threat of impending injury." *Chem–Trend Inc. v. McCarthy,* 780 F.Supp. 458, 460 (E.D.Mich.1991). The irreparable harm must be "actual and imminent," not "remote" or "speculative." *Id.* Actual, as opposed to speculative or hypothetical, injury mirrors the actual and concrete nature of injury in fact. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). Thus, Plaintiffs have "the burden of proving a clear showing of irreparable injury." *ECRI v. McGraw–Hill, Inc.,* 809 F.2d 223, 226 (3d Cir.1987) (internal quotations omitted). Plaintiffs, however, cannot meet this burden.

■ Plaintiffs' affidavits fail to furnish evidence from which the Court can determine that their members' past activity has occurred, or future activity will occur, in or around the small amount of areas affected by timber harvesting or road construction. More importantly, Plaintiffs' affidavits do not specifically evidence that any of their members have suffered, or will suffer, an injury as a result of any Forest Service action. Rather, Plaintiffs' affidavits almost uniformly contain vague and speculative references to general environmental damage that could occur if the Forest Service does not comply with the WSRA. While some of the affidavits do contain specific references to areas of the park where the affiants have recreated in the past, they do not provide any information regarding the affected areas. For example, Scott Berry, in his affidavit, contends that he enjoys "the areas that are the subject of this lawsuit," but he does not specify to which areas in the nearly one million acres of

HNF he is referring. Similarly ambiguous statements are made by Kraig Klungness and Daniel Patterson, while Douglas Cornett provides a laundry list of areas he enjoys without specifying that his activities occurred within those areas. While many of Plaintiffs' affidavits repeatedly state that they are offended that the Forest Service is not fulfilling its obligations under the WSRA, they fail to connect their concern to any concrete harms.

Only one affiant mentions a specific example of how the Forest Service's inaction may have negatively impacted any of the DWSRs. Raymond Weglarz states that he witnessed some timber cutting on the banks of a DWSR in HNF. However, his affidavit fails to provide any critical details about his observations, such as a date, that might link the timber harvest to any alleged Forest Service environmental infractions. It is impossible for the Court to determine if injunctive relief is appropriate here, because it cannot determine whether the timber harvest is ongoing or completed. There is also no indication that this observed timber harvest would be impermissible under the WSRA.

Just as significant is the fact that none of the affiants allege that they have observed any timber harvesting or road construction in DWSRs within HNF. In fact, the Forest Service states that none of these activities are occurring, or are scheduled to occur, within HNF. The total absence of Forest Service activity in HNF is fatal to that portion of Plaintiff's claim.

The Court thus concludes that Plaintiffs' affidavits show, at best, a theoretical possibility of harm. This falls far short of a showing of actual irreparable harm required for injunctive relief. Plaintiffs' motion for summary judgment will accordingly be denied.

## B. Defendants' Motions for Summary Judgment

■ Defendants contend that they are entitled to summary judgment because Plaintiffs lack Article III standing. Standing lies at the heart of this Court's subject matter jurisdiction. *TCG Detroit v. City of Dearborn*, 206 F.3d 618, 622 (6th Cir. 2000); *Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 279 (6th Cir.1997) (citing *Allen v. Wright*, 468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984)). Questions of standing, as a matter of law, must be decided before the merits of a case can be addressed. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101–05, 118 S.Ct. 1003, 1016–18, 140 L.Ed.2d 210 (1998). In order to establish Article III standing, a plaintiff must show the following:

> First, the plaintiff must have suffered an "injury in fact"-an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) (internal citations and footnote omitted). Defendants' standing challenge focuses upon the injury in fact, causation, and redressability requirements.[6]

---

**6.** Defendants do not challenge Plaintiffs' standing on prudential grounds, i.e., whether

the interests the Center for Biological Diversity, Northwoods Wilderness Recovery, and Su-

### 1. *Injury In Fact*

 In order to demonstrate injury, a plaintiff cannot simply rely upon injury to the environment in general; rather, the plaintiff must show that he has or will suffer some individualized, concrete harm as a result of a violation of the statute. *Defenders of Wildlife*, 504 U.S. at 573 n. 8, 112 S.Ct. at 2143 n. 8. A plaintiff "must somehow differentiate himself from the mass of people who may find the conduct of which he complains to be objectionable only in an abstract sense." *Friends of the Earth v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 156 (4th Cir.2000). This requirement fulfills Article III's case or controversy requirement by ensuring that suit is brought by a plaintiff facing an injury to a concrete interest to protect rather than "a roving environmental ombudsman seeking to right environmental wrongs wherever he might find them." *Id.* at 157.

The Supreme Court has held that in the context of environmental laws, "plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 183, 120 S.Ct. 693, 705, 145 L.Ed.2d 610 (2000) (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735, 92 S.Ct. 1361, 1366, 31 L.Ed.2d 636 (1972)). In *Ecological Rights Foundation v. Pacific Lumber Co.*, 230 F.3d 1141 (9th Cir. 2000), the court stated:

Under *Laidlaw* ... an individual can establish "injury in fact" by showing a connection to the area of concern sufficient to make credible the contention that the persons's future life will be less enjoyable—that he or she really has or will suffer in his or her degree of aesthetic or recreational satisfaction—if the area in question remains or becomes environmentally degraded. . . .

. . . . [A] person who uses an area for recreational purposes does not have to show that he or she lives particularly nearby to establish an injury-in-fact due to possible or feared environmental degradation. Repeated recreational use itself, accompanied by a credible allegation of desired future use, can be sufficient, even if relatively infrequent, to demonstrate that environmental degradation of the area is injurious to that person.

*Id.* at 1149.

Defendants contend that Plaintiffs lack standing under the Supreme Court's decisions in *Lujan v. National Wildlife Federation*, 497 U.S. 871, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990), and *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), and this Court's decision in *Heartwood Inc. v. United States Forest Service*, No. 1:00–CV–683, 2001 WL 1699203 (W.D.Mich. Dec.3, 2001). In *National Wildlife Federation*, an environmental organization filed suit challenging the Bureau of Land Management's ("BLM") "land withdrawal review program" under the Federal Land Management Act of 1976 and NEPA. The BLM program involved approximately 1,250 individual classification terminations and withdrawal revocations of federal

---

perior Wilderness Action Network seek to protect are within the zone of interests protected by the WSRA, the NFMA, and the NEPA. *See Cent. S.D. Coop. Grazing Dist. v. Sec'y of the United States Dep't of Agric.*, No. 00–3567, 2001 WL 1111471, at *3 (8th Cir. Sept.24, 2001). The Court concludes that the

Center for Biological Diversity, Northwoods Wilderness Recovery, and Superior Wilderness Action Network have prudential standing because they are organizations concerned with the protection of the environment, which implicates the WSRA, the NFMA, and the NEPA's core concerns.

lands, some of which would result in opening up lands to mining activities. In response to the defendants' motion for summary judgment on the issue of standing, the plaintiff offered affidavits of its members for the purpose of demonstrating that the decisions of the BLM affected the individual interests of the plaintiff's members. One affiant stated that she used lands "in the vicinity" of an area opened to mineral leasing and mining, which constituted only 4,500 acres of a two million acre area. The second affiant made similar "in the vicinity" allegations regarding use of land located within a very large tract of land. The Court held that although the affidavits established harm that met the "zone of interest" test, they were insufficient to demonstrate that the plaintiff's members would suffer injury as a result of the government's actions because the allegations were too general. 497 U.S. at 886–87, 110 S.Ct. at 3187–88. In rejecting the court of appeals' reasoning that the "in the vicinity" statement in the first affidavit must have included land within the 4,500 acre area and that any ambiguity should have been resolved in favor of the plaintiff (the non-moving party), the Supreme Court observed that for purposes of a summary judgment motion, an affidavit must contain specific facts demonstrating injury:

> At the margins there is some room for debate as to how "specific" must be the "specific facts" that Rule 56(e) requires in a particular case. But where the fact in question is ... whether one of respondent's members has been, or is threatened to be, "adversely affected or aggrieved" by Government action—Rule 56(e) is assuredly not satisfied by averments which state only that one of respondent's members uses unspecified portions of an immense tract of territory, on some portions of which mining activity has occurred or probably will occur by virtue of the governmental action. It will not do to "presume" the

missing facts because without them the affidavits would not establish the injury that they generally allege. That converts the operation of Rule 56 to a circular promenade: plaintiff's complaint makes general allegation of injury; defendant contests through Rule 56 existence of specific facts to support injury; plaintiff responds with affidavit containing general allegation of injury, which must be deemed to constitute averment of requisite specific facts since otherwise allegation of injury would be unsupported (which is precisely what defendant claims it is).

*Id.* at 889, 110 S.Ct. at 3189.

In *Defenders of Wildlife*, the plaintiffs filed suit seeking a declaration that a rule adopted by the Secretary of the Department of the Interior requiring consultation with respect to endangered or threatened species only for actions taken in the United States or on the high seas was contrary to the Endangered Species Act of 1973. To establish standing, the plaintiffs alleged injury as a result of activities occurring abroad which were funded by the United States and tended to increase the rate of extinction of endangered and threatened species. However, the Court noted that the plaintiffs would still have to show that one or more of their members would be directly affected by the government's actions apart from any special interest in the subject, i.e., threats to the particular species. *Defenders of Wildlife,* 504 U.S. at 563, 112 S.Ct. at 2137–38. Two members submitted affidavits in which they stated that they had visited foreign countries (Egypt and Sri Lanka) where the United States was involved in projects affecting endangered species and had observed or attempted to observe those endangered species. *Id.* at 563, 112 S.Ct. at 2138. The members also stated that they intended to return to those counties in the future to observe those species, but they did not give any specifics about their plans to do

so. The Court held that the affidavits were insufficient to show a likelihood of future harm because "[s]uch 'some day' intentions-without any description of concrete plans, or indeed even any specification of *when* the some day will be-do not support a finding of the 'actual or imminent' injury that our cases require." *Id.* at 564, 112 S.Ct. at 2138 (emphasis in original).

■ The Court concludes that the statements in the affidavits offered by Plaintiffs about use of the DWSRs in ONF and HNF are similar to the "in the vicinity" statements in *National Wildlife Federation.* The common characteristic of this case and *National Wildlife Federation* is an action or actions involving small, discrete areas of a very large tract of land. Of ONF's nearly one million acres, the Forest Service has undertaken, or will undertake, selected timber cutting on only 403 of the 31,200 acres occupied by DWSRs. The total amount of road construction in ONF will be just over one mile. Additionally, the Forest Service has no current or future plans to undertake any timber cutting or road building within any of the DWSRs in HNF.

The Supreme Court made it very clear in *National Wildlife Federation* that when faced with a motion for summary judgment on the issue of standing, a plaintiff must do more than assert generalized allegations in an affidavit which could *conceivably* demonstrate use of the affected land; rather, a plaintiff must set forth specific facts showing injury from use of the affected land. *See People for the Ethical Treatment of Animals v. Dep't of Health & Human Servs.,* 917 F.2d 15, 17 (9th Cir. 1990) (stating that "Rule 56(e) is not satisfied by averments which state only that the declarant uses unspecified portions of a large metropolitan area, on some portions of which hazardous substances might be transported or disposed"). The affidavits before the Court do not meet that requirement.

Plaintiffs also assert that in *Heartwood,* this Court recognized that "more generalized standing allegations may suffice to satisfy the injury in fact analysis." (Pls.' Mem. Opp'n to Defs.' Mot. Partial Summ. J. at 16.) Specifically, Plaintiffs point to this Court's statement that "generalized allegations of use may suffice" for standing "where the action alleged to cause the injury will affect a large area or has general application to a large area." *Heartwood,* 2001 WL 1699203, at *8. Plaintiffs, however, read *Heartwood* too broadly. In *Heartwood,* this Court was merely pointing out a situation where a generalized allegation may be appropriate. This Court cited the Ninth Circuit's decision in *Salmon River Concerned Citizens v. Robertson,* 32 F.3d 1346, 1352-55 (9th Cir.1994), as one such example. *Robertson* involved spraying of herbicides in connection to a reforestation program that covered approximately six million acres of national forest. *Id.* A distinction was drawn between situations where very large areas would generally be affected, and situations where the harm would be much more contained and localized. *Id.*

Plaintiffs' claim, at best, presents the latter. Unlike the large-scale herbicide spraying in *Robertson,* Plaintiffs' alleged generalized injury from the Forest Service's failure to comply with the WSRA is merely hypothetical. The only actual injuries of which Plaintiffs complain in their affidavits are specific instances of timber harvest and road construction. Their allegations of injuries are directly analogous to those rejected by this Court in *Heartwood,*[7] and accordingly fail to present injury in fact.

---

7. Plaintiffs' reliance on *Friends of the Earth v. Laidlaw Evtl. Servs.,* 528 U.S. 167, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000), a case involving

As discussed above, Plaintiffs' affidavits simply show a theoretical possibility of harm. None of the affidavits states that any of Plaintiffs' members have experienced, or will experience, the results of the Forest Service's current or future timber harvests or road construction in ONF. Only one affiant, Raymond Weglarz, states that he observed some timber cutting in ONF, but he does not specify when or where he made this observation with sufficient detail. Additionally, Plaintiffs' affidavits make no specific claims of injuries suffered as a result of timber harvest or road construction in HNF, and the Forest Service states that no such activity is currently taking place or planned for the future. Plaintiffs have thus not shown that they have suffered injury in fact because they cannot trace any actual injury to the Forest Service's failure to prepare CMPs or establish detailed boundaries for DWSRs in ONF and HNF.

## 2. *Causation*

Defendants also assert that Plaintiffs lack standing because Plaintiffs have not shown a causal link between their alleged injury and the Forest Service's failure to comply with the WSRA. To show causation, Plaintiffs must demonstrate "a fairly traceable connection between the [Plaintiffs'] injury and the complained-of conduct of the [D]efendant[s]." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103, 118 S.Ct. 1003, 1017, 140 L.Ed.2d 210 (1998). Thus, Plaintiffs must show that but for the Forest Service's failure to prepare CMPs and establish detailed boundaries for DWSRs in ONF and HNF, the esthetic harms of which Plaintiffs complain

would not occur. Plaintiffs, however, fail to make this showing.

Plaintiffs' affidavits offer only vague and conclusory statements regarding the impact of the absence of CMPs and detailed river boundaries. The affidavits fail to explain how the Forest Service's compliance with the WSRA would differ from the Forest Service's current Forest Plan or one-quarter mile boundaries. Plaintiffs also do not allege that any specific Forest Service activity in ONF or HNF is, or would be, impermissible under the WSRA. This is especially important in light of the fact that some timber harvest and road construction is permissible under the WSRA, as long as such activities are conducted in compliance with Forest Service's statutory obligation to preserve the DWSRs according to their designation. Instead, Plaintiffs' affidavits are replete with generalized statements decrying all timber harvest and road construction in ONF and HNF. Accordingly, the Court finds that Plaintiffs have not shown causation.

## 3. *Redressability*

Defendants also assert that Plaintiffs lack standing because Plaintiffs have not shown that their injury is redressable. To show redressability, Plaintiffs must demonstrate "a likelihood that the requested relief will redress the alleged injury." *Steel Co.*, 523 U.S. at 103, 118 S.Ct. at 1017. Thus, Plaintiffs must show that the injunction they seek will likely ameliorate the aesthetic harm they allege that their members have suffered. Plaintiffs, however, fail to make this showing.

river pollution, is also unavailing. *Friends of the Earth* is distinguishable because each of the plaintiff's members in that case, even those living or desiring to recreate several miles from the source of the pollution, were able to establish injury in fact by showing some plausible, direct contact with the pollut-

ed river in a physical sensory manner. *Id.* at 181–82, 120 S.Ct. at 704–05. Here, Plaintiffs' members do not allege that they have actually been injured by any of the timber harvest or road building, and unlike the river pollution in *Friends of the Earth*, these alleged environmental injuries are geographically localized.

Plaintiffs' affidavits offer little more than vague and speculative statements about the impact of the Forest Service's compliance with the WSRA. Typical of the affidavits is Rob Cadmus' statement that: "I feel that my experiences and continued use of these rivers are in danger of being degraded so long as the protective requirements of the Wild and Scenic Rivers Act are not met." (Cadmus Decl. ¶ 6.) Similarly, Kraig Klungness states: "The lack of management plan for Wild and Scenic River corridors, the proposed timber cutting and road building within these corridors, and the subsequent destruction of the land causes and will continue to cause substantial injury to my use and enjoyment of the Ottawa National Forest." (Klungness Decl. ¶ 9.) These general statements do not satisfactorily show how or why the injunction Plaintiffs seek will ameliorate the alleged harm. Accordingly, the Court finds that Plaintiffs have not shown redressability.

### Conclusion

For the foregoing reasons, Defendants' motions for summary judgment will be granted on the grounds that Plaintiffs lack standing, and Plaintiffs' motion for summary judgment will be denied.

An Order consistent with this Opinion will be entered.